Buisson vs. Huard.

_____

### No. 13,835.

FERNAND J. BUISSON vs. AUGUST HUARD.

### SYLLABUS.

The aspersions of the defendant upon the plaintiff's character were neither just nor well founded.  In view of the fact, however, that he did not originate, nor volunteer the matters complained of, but made use of them in answer to enquiries made of him by interested parties, touching defamatory remarks made by other persons, the court holds him protected from an action for damages under the rules which the court refers to governing privileged, confidential communications.

APPEAL from the Civil District Court, Parish of Orleans.— Ellis, J.

_____

*James J. McLoughlin,* for Plaintiff, Appellee.

*Henry Chiapella* and *Gustave V. Soniat,* for Defendant, Appellant.

## STATEMENT OF THE CASE.

The opinion of the court was delivered by

NICHOLLS, C. J. The plaintiff charges that in April, 1900, in a public place, to-wit: the clerk's office of the Criminal District Court for the Parish of Orleans, and in the presence and hearing of several persons, the defendant wilfully, maliciously and falsely stated to one C. A. White that petitioner was a thief; that he had stolen some money from a succession, and that he was unfit to associate with any respectable family. That in the month of August, 1900, the defendant stated, in his office on Carondelet street, and in the presence of said White, Charles A. Turgeaux, Laroque and Armand Demare, that petitioner was a thief; that he had stolen three hundred dollars from a succession; that he was a "crapule," a "bon-a-rien," and that he was unfit to associate with any respectable family. That petitioner was a young man, twenty-five years of age, a native of New Orleans, where he had resided all his life; that he had since 1898 been visiting, with matrimonial intentions, and intended to marry a young lady of that city. That said White and Demare were the brothers in law of said young lady. That said slanderous statements communicated by these persons to the father and mother of the young lady resulted in their excluding petitioner from their house and forbidding him from visiting their daughter and their daughter from seeing him, and preventing him also from continuing his attentions to her. That defendant made said statements slanderously and maliciously and wilfully, with the intention of injuring petitioner in character and reputation by making such statements public, and that petitioner had been injured in his character and reputation and had been prevented from associating with this young lady whom he had been so visiting, whose parents had since refused to permit him to visit their house; that these said slanderous statements had so poisoned the minds of the parents of the young lady and the parties to whom the statements were made that they really believed him to be what defendant so maliciously charged him with being, to-wit: a thief and a person of bad character. That said slanderous and malicious statements had caused him great suffering and anxiety of mind and had injured him as stated; that the extent of the injury was not less than five thousand dollars, for which he prayed for judgment, with interest.

After pleading a number of exceptions, which were overruled, defendant answered, after pleading first the general issue. He then averred that it was not true that he had made any statements concerning plaintiff, slanderously, maliciously and wilfully, with the intention of injuring him in character and reputation, by making such statements public as was alleged in the petition; that he entertained no malice towards the plaintiff, who was a distant relative of his, and that he had no motive, interest or objection to plaintiff's entering into the family of the young lady mentioned, and marrying her. He averred that on a certain occasion in the month of March, 1900, he was sent for by the mother of the young lady, several of her sisters and a brother-in-law to call at the latter's residence, and was there interrogated by the mother relative to a statement derogatory to plaintiff's character and reputation which had been made by two young ladies belonging to defendant's family, and, when asked to affirm or deny such statement, defendant had frankly and manfully admitted such and said that plaintiff had not acted honestly in the matter of certain succession proceedings in the Republic of Mexico, the winter before, when he had been sent there in the interest of the two young ladies who were nieces of respondent, and that he had drawn from the attorney of said succession in Mexico three hundred dollars of the succession funds, which he had appropriated to himself and could not legitimately account for; that he added that, to cover his said deficit and appropriation of the succession funds belonging to his nieces as heirs of said succession, he had rendered them an account which was false, illegal and extortionate. That at said interview no one was present but the mother of the young lady, one of her sisters and a brother-in-law; that the matter was strictly confidential and kept a secret between them.

That subsequently, in April, 1900, plaintiff having caused certain criminal proceedings to be instituted in the Criminal District Court against the two young ladies, relatives of respondent, respondent having been summoned as a witness before the Grand Jury, one George A. White, a brother-in-law of the young lady to whom plaintiff referred, met respondent in the clerk's office of said court and interrogated him on the same subject, and respondent then and there frankly and manfully repeated to said White what he had said in the private interview with the other parties concerning the rendition of the false account by plaintiff in the succession matter before stated, and produced and exhibited to him the written account of plaintiff which

White then and there read, and respondent characterized the transaction as a swindling operation.

That no one was present at said interview but White and himself, and that what was said was in the nature of a confidential communication.

That subsequently, in April, 1900, the said White, together with another brother-in-law of the young lady and Mr. Laroque Turgeau, called at respondent's office on Carondelet street and asked him to affirm or deny what he had said to Mr. White as before stated, and' that respondent, while not desirous of doing injury to plaintiff or preventing his marriage, could not but reiterate the truthful statements concerning the succession matters in Mexico and the manner in which plaintiff had obtained and misappropriated the funds of the succession. That the matter was strictly confidential between all parties, and whatever severe expressions were used by respondent on this occasion in his own office, privately and outside of the presence of any person except the three interviewers, were provoked and solicited by them, and could not constitute a slanderous accusation or malicious publication with intent to injure the reputation of plaintiff. Respondent denied that plaintiff had suffered any injury from anything said or done by him, or that he was in any way connected with the frustration of his matrimonial designs, and in justification of his remarks concerning the falsity of the written account rendered, he annexed a copy thereof to his answer.

The District Court rendered judgment in favor of the plaintiff against the defendant for two hundred and fifty dollars, and defendant appealed. Appellee moved in the Supreme Court for an increase in the amount of judgment.

## OPINION.

To come to a full understanding of the facts of this case, it will be necessary to go further back in dates than those which are referred to in plaintiff's petition. The first ground of complaint against defendant which is set up therein is a conversation between defendant and George A. White at the Criminal District Court, in April, 1900. That conversation was the result of antecedent matters which have to be recited.

The plaintiff and the defendant are distantly related to each other, and up to the happening of the matters from which this litigation

arose were on friendly and intimate terms. On one of the visits of the plaintiff to defendant's house a conversation took place in reference to some property in Mexico which had been inherited by two young ladies, nieces of the defendant, who were inmates of his family. The interests of these young ladies were in the hands of an attorney in Mexico, but it was suggested by him that an American should be sent in their interest to Mexico to ascertain the exact situation. The plaintiff was a young unmarried man, twenty-five years of age, a man evidently without much means, he being a reporter upon the States (newspaper), with a salary of six dollars a week. Plaintiff expressed a willingness, if not a desire, to go upon this trip, and his services were accepted. Before proceeding to Mexico, he went on to Washington to obtain a letter of recommendation from Senator McEnery and also to obtain other papers as were deemed necessary. On leaving New Orleans for Mexico, he took with him a letter written in Spanish by a friend of the young ladies to the attorney in Mexico, in which letter plaintiff was referred to as their cousin. The young ladies advanced him a certain amount of money for this trip. On reaching Mexico and conferring with the attorney of the succession, plaintiff ascertained that its value had been greatly exaggerated. That it consisted mostly of real estate in a remote part of the Republic which could not be easily disposed of. After remaining in Mexico some ———— days, plaintiff returned to New Orleans, bringing with him a watch and some trinkets, but no money, and a very disappointing account of the situation. On reaching New Orleans he went at once to defendant's house on a Sunday to see the young ladies and make a verbal report. In the course of the conversation which then took place he made known to them that plaintiff, while in Mexico, had obtained three hundred dollars in Mexican money from the attorney (about ———— ———— dollars in American money), to be charged to their account; that he had expended in various ways this money and that with which he had been furnished by the young ladies when he started on his trip, and a small amount which had also been forwarded to him at his request by a telegram; that he had returned by railway instead of part of the way by boat and that he had a small balance left.

The young ladies became very much excited and incensed on receiving this information, used violent and abusive language to him and made him leave the house. In the testimony of one of these ladies, taken on this trial, she said that she had then told him "If you don't

return everything you took, we will speak about it to everybody, especially the young lady you are courting"; that he said he would return it, but changed his mind afterwards. She testified further that she had mentioned it to everybody who had an interest in their affairs; that she told them "the American had robbed them"; that she went herself and told the sister of the young lady whom he was courting, and the same night he was refused the house. The other young lady testified: "My sister and myself went to see the young lady he was courting and told her he had robbed us; told her what had happened, and that he had robbed us, and on the same night the lady put him out."

Defendant testified that after this visit by his nieces the family of the young lady sent for him to know if his nieces were not mistaken; that he had said: "Unfortunately we had too much confidence in him, and what my nieces said is so; he acted dishonestly with my nieces."

He testified that he had not volunteered to go to the family; that they had sent for him; that he went to the house of a brother-in-law of the young lady, and he sent for her mother and several of her sisters, and they requested him to tell them; he said he did not want to go, but they sent for him several times, and, after repeated calls, he went; that he said: "Yes, what I tell you is right; my nieces told you the truth."

· It appears that after receiving the charges against plaintiff, he was forbidden to visit the house until he should have exonerated himself.

With that object in view, he wrote a letter to the foreman of the Grand Jury, making him a statement of what had occurred from his standpoint. The letter closed by saying: "As a means of vindication I earnestly and respectfully request your honorable body to summon before you these parties" (naming the nieces of the defendant and the mother of one of the sisters of the young lady referred to), "and to take their sworn statements concerning the matters hereinbefore set forth, and, if they prove, in law, to return a true bill of indictment against me for whatever offense may be shown, in order that I may answer in open court before a jury of my fellow citizens and demonstrate my entire innocence of any dishonest act or wrong-doing in the premises and thus reinstate myself in the opinion of those whose esteem I value, and if the said sworn statement prove insufficient for an indictment, I pray your honorable body to make that fact public by the return of no true bill against me. I being willing to undergo

the appearance of a pending criminal prosecution against me for the sake of clearing my good name rather than a criminal prosecution or a civil suit against the women who have inflicted this wrong upon me."

The Grand Jury seem to have taken no action further than summoning defendant's nieces. Defendant himself and the wife of George A. White, who was a sister of the young lady referred to. Plaintiff and defendant and Mrs. White seem to have been the only ones who went before the Grand Jury. It would appear from the testimony taken on the trial that up to that time defendant and his nieces were under the impression that plaintiff was seeking to have an indictment returned against the latter. George A. White accompanied his wife to the office of the Clerk of the Criminal District Court, and, while he and the defendant were sitting there (defendant waiting to be sent in to the Grand Jury room as a witness) the subject-matter of plaintiff's conduct was brought up between these two.

Referring to the conversation, White testified that they were talking first of business, and then the defendant told him that plaintiff was a little thief; that he had stolen the scucession of his nieces. That the ladies who had been summoned as witnesses and one other lady were in the room; they were about twenty feet away; the conversation was not loud enough for anyone to have overheard it; he did not go there by appointment; he went to accompany his wife.

Who started this conversation does not appear. We should judge from defendant's testimony that at some time prior to this White had called at defendant's house and spoken to him about the matter, and asked him if what his nieces had told him was correct; he did not volunteer a statement to Mr. White; that he did not want to speak of the matter. He testified that he had never spoken to any one of the matter other than to the interested parties themselves, who came to him and begged him to tell them if it was true. White knew, in the clerk's office, what the matter was for which the parties were there; defendant showed him at the time the account which plaintiff had preserved, saying: This is an honest man's statement. Do you call this honest? Two suits of clothing, room rent, underwear, socks, etc." That White read a part of the account, but not all, as he (witness) was called into the jury room.

He testified, further, that subsequently to this George White and Mr. Desmare (two brothers-in-law of the young lady) and Mr. Laroque Turgeau called on him at his office on Carondelet street, and asked

him to talk about the matter, and he said: "Look here, now, if you care to speak about that man, I won't be bothered; he is not really worth talking about." They insisted that they came as amicable parties, saying: "We only want to know if what Mr. White told us is so; we don't come here for anything else"; that he said: "That he did not care to talk about it; he did not volunteer any remarks to these parties. He said he had no malice against plaintiff; did not desire to injure him; had no interest in preventing his marriage, and had no knowledge that his nieces proposed saying anything about the matter to the young lady or her family; that he spoke only when called on by the family." In answer to a question how it was if he had no interest in breaking off plaintiff's marriage, he spoke to the family about the matter as he did, he said: "You want my nieces to be liars to that family? I said my nieces were right in saying so; I couldn't say otherwise when he robbed them of $300."

From the testimony it appears that White must have stated to some one that defendant had made charges to him against the plaintiff, and this fact had been denied; that White, deeming his veracity at issue, called with Laroque Turgeau and Desmare upon defendant and got him to admit the fact that he had made such statements to him. That defendant was reluctant to talk upon the subject, but, as the matter seemed to be taking the shape of simply saying whether he had spoken to White as the latter had declared he had spoken, defendant admitted the fact; thereupon the parties left, and shortly after this suit was brought.

The defendant claims that plaintiff's demand is neither just nor well founded; for, whatever he may have said of the plaintiff was protected from being made the basis of an action for damages by reason of being privileged and confidential communications.

Newell in his work on Defamation, Slander and Libel, under the heading of Privileged Communications, Chapter 19, p. 388, defines a privileged communication to be one made in good faith upon any subject-matter in which the party communicating has an interest or in reference to which he has or honestly believes he has a duty to a person having a corresponding interest or duty and which contains matter which without the occasion upon which it was made would be defamatory and actionable. The occasion on which the communication was made rebuts the inference of malice *prima facie* arising from

a statement prejudicial to the character of the plaintiff and puts upon him the burden of proving that there was malice; in short, that the defendant was actuated by motives of personal spite or ill will, independent of the occasion on which the communication was made. A communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or proper cause when so made in good faith. The law does not imply malice from the communication itself as in ordinary cases. Actual malice must be proved before there can be a recovery, and in the absence of such proof a non-suit should be granted.

Privileged communications are of two kinds, absolutely privileged or communications qualifiedly privileged.

Complete immunity is confined to cases where the public service or the due administration of justice require it. In less important matters, where the interests of the public do not require that the speaker should be freed from all responsibility, but merely requires that he should be protected so far as he is speaking honestly for the common good, in these the privilege is said to be qualified, and the plaintiff will recover in spite of the privilege if he can prove that the words were not used *bona fide,* but that the defendant availed himself of the privileged communication wilfully and knowingly to defame plaintiff.

. Notwithstanding the words are used on a privileged occasion, plaintiff can still be heard to say that the defendant did not act under the privilege; that he did not intend honestly to discharge a duty, but maliciously availed himself of the privileged communication to injure the plaintiff's reputation. (Odgers on Libel and Slander, pages 168, 169 and 170.)

Among the occasions on which the statements of parties touching another person are protected as a privilege qualifiedly are: where the circumstances of the case are such as cast a duty upon the former of making them in the *bona fide* performance of such duty; These communications may be made sometimes to an entire stranger, sometimes to parties between whom and themselves there are intimate relations of friendship, sometimes they may be made under a sense of duty to his own family or to himself. The same words which uttered to one person may be held privileged, might not be so held when uttered to another.

The duty referred to need not be a legal duty. Any moral or social

duty of imperfect obligation will suffice. It is sufficient if he honestly believe that he has a duty to perform in the premises, though it may turn out that the circumstances were not such as he reasonably concluded them to be. He must, however, have believed in the truth of his statements at the time he made them. If a man knowingly makes a false charge against his neighbor, he cannot claim privilege. It never can be his duty to circulate lies. Even when a man, in making statements, is acting under a strong sense of duty and believing in their truth, he should not be led away, even by honest indignation, into exaggerated or unwarrantable expressions, for the privilege extends to nothing which is not justified by the occasion. (Odgers, pp. 179 *et seq.*)

As illustrative of the different circumstances under which communications may be held so privileged, decisions can be cited declaring that statements made by a judge in the performance of his duty are privileged, so are those made by a witness while giving testimony, but statements made by a witness while walking about the court, or before or after he has given his evidence, are not privileged. (Odgers, p. 175, citing authorities.) That, while a father, guardian or intimate friend may warn a young man against associating with a particular individual, or may warn a lady not to marry a particular suitor, it would be under the same circumstances considered officious and meddlesome if a mere stranger gave such warning. (Odgers, 191, 192.)

A fact having a very great influence in the determination of the question as to whether a particular communication is of a privileged character or not, is whether it was made in answer to enquiries made or as a volunteered statement.

Where once a confidential enquiry is set on foot and communications are made thereat of a privileged character, those made at subsequent interviews between the parties, it has been held, will be privileged so long as what takes place thereat is still relevant to the original inquiry. (Odgers, p. 186; Am. and Eng. Ency. of Law, Vol. —, p. —.

It has also been held that, if, after having made statements derogatory of the character of another, a party is called upon at the instance of that person to admit whether he had made such statements, and he acknowledged having done so, no action can be brought for the acknowledgement, but the party injured must sue for the words previously spoken and use the acknowledgement as proof that these words had been spoken. But if, besides saying yes to the question asked,

he repeats the words in the presence of a third person, asserting his belief in the accusation and that he can prove it, such a statement is slanderous and not privileged, though elicited by the plaintiff's question.

Keeping these general principles in view, we have reached the conclusion that, under the evidence, the charges made against the plaintiff in the various interviews were entirely unwarranted by the facts of the case; that the plaintiff was guilty of no dishonest or wrong doing; that whatever difference of opinion may have existed between the parties as to the extent of plaintiff's powers in the premises, and the correctness of his accounts and his expenditures, were not of a character to give rise to any charge of criminality, but at most should have been adjusted by a civil proceeding after full and cool discussion.

Had these differences been between the plaintiff and the defendant, and he had thereupon followed the course which his nieces pursued, he would unquestionably have subjected himself legally to a claim for damages at the hands of the plaintiff.

In seeking out the family of the young lady and making the charges which were made and causing plaintiff's engagement to have been broken off, his action in the matter would not have been by way of warning in the interest and for the good of the young lady. The motive and feeling inspiring the act would have been one of resentment against the young man and the object in view to punish him. That course would have been indefensible.

But the defendant came into this controversy as a third party, drawn and almost forced into it by reason of the relations with the parties primarily concerned. He could not avoid the situation. He was certainly placed in a very trying position. The wrong shown was done prior to his connection with the matter by parties for whom he was not legally responsible, though they were his relatives. It is possible that had he repudiated the acts and statements of his relatives, the wrong and damage might have been undone, but of that there is no certainty. He declined, however, to render any assistance in this direction and sustained his nieces. Whether he actually reached the same conclusions touching the plaintiff's conduct which they had reached, is a matter we ourselves cannot determine. The furthest we can go in that direction is to say that there was, in our opinion, no legal basis for these conclusions; that they were exaggerated and expressed in extravagant terms.

But plaintiff does not base his cause of action on what was then said. In his petition he does not go back of what the defendant told White on the occasion of their being together at the office of the Clerk of the Criminal District Court. Who commenced the conversation at that time relatively to the plaintiff does not appear. In the absence of explicit testimony on that subject, we must assume it was White. That conversation was not the initial conversation between those parties on that matter. It was a resumption of a prior conversation which had occurred at defendant's house in an interview which had evidently been sought by White. The conversation at the court was between the same parties on the same subject, with no other than themselves hearing or taking part. The communications had the same character as those made at defendant's house. If the defendant was liable for anything which he said on either of those occasions, the liability rested entirely on his exaggeration of the facts of the case and the wrongful conclusions.

We next come to the interview at defendant's office, between White, Desmare and Laroque Turgeau and the defendant.

That interview was brought about by White, who having repeated to one of his sisters-in-law (doubtless the young lady, Miss Blanche) what Huard had told him about the plaintiff, found his truthfulness called into question, and, with a view of establishing the fact that Huard had made the statements which White had attributed to him, White, accompanied by Desmare and Turgeau, whom he got to go with him, went to the defendant's office. They went there, according to Mr. Turgeau, to confront Mr. Huard. The latter was reluctant to say anything about the matter, but being pressed, admitted that he had made statements to Mr. White as the latter had declared he had. The *statements themselves* seem to have been then and there repeated, but whether Mr. White had insisted that Huard should not only admit that he had "made statements," but recite what those statements were, so far as to verify the correctness of what he had reported to his sister-in-law, does not appear. It is very probable, most likely, that he did so at White's instance. It will be seen that this interview was between Turgeau, Desmare, White and the defendant, the only "third party" present being Turgeau, who had been asked by White to accompany him as a "witness." Desmare was one of the brothers-in-law, and must evidently have known everything connected with the matter before he went to Huard's office. We have given this case careful con-

.sideration, for we are of the opinion that the plaintiff has been much wronged and damaged, but, after considering this unfortunate family matter in all its bearings, we have come to the conclusion that the wrong and damage done to plaintiff was really done by other parties, for whose acts he, Huard, should not be held liable. Doubtless out of consideration he has sued the wrong parties.

For the reasons assigned, it is hereby ordered, adjudged and decreed that the judgment appealed from be and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that plaintiff's demand be rejected and his suit dismissed with costs in both courts.

BLANCHARD, J., dissents, holding the plaintiff is entitled to a judgment for some amount.

Rehearing refused.