(56 South. 318.)

No. 18,387.

RICHARDSON v. COOKE et al.

(June 15, 1911. Rehearing Denied Oct. 16, 1911.)

(Syllabus by Editorial Staff.)

1. LIBEL AND SLANDER (§ 45*)—PRIVILEGED COMMUNICATIONS—"QUALIFIED PRIVILEGE."

Letters written in due course of business by an insurance adjuster, addressed to insurers, to show their liability to contribute their pro rata share of the expenses incurred by the adjuster in securing an adjustment of the loss at a sum substantially less than the adjustment made by the addressees' adjuster, which refer to such adjuster as incompetent and unable to protect the interests of insurers, and state that his conduct as adjuster was reprehensible, unprofessional, and silly, are qualifiedly privileged, and do not go beyond the privilege, and do not by themselves indicate malice, in view of the fact that the writer, in making the adjustment, had been handicapped by the adjustment made by the addressees' adjuster, who had procured an adjustment for the addressees on the condition that insured would reimburse addressees, provided any other adjuster found a less loss acquiesced in by insured; a "qualified privilege" existing where the person making the communication complained of has an interest in the subject-matter, and the person to whom the communication is made has a corresponding interest, and the privilege extending to all such communications made bona fide.

[Ed. Note.—For other cases, see Libel and Slander, Dec. Dig. § 45.*

For other definitions, see Words and Phrases, vol. 7, p. 5877.]

2. LIBEL AND SLANDER (§ 21*) — LIBELOUS LETTERS.

A letter by an insurance adjuster, reciting that he was not associated with any other adjuster, did not solicit business, and was not an "ambulance chaser," did not necessarily carry the implication that another adjuster was, so that he could predicate libel thereon.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 103; Dec. Dig. § 21.*]

Appeal from Civil District Court, Parish of Orleans; Walter B. Sommerville, Judge.

Action by Henry D. Richardson against William A. Cooke and others. From a judgment for plaintiff, defendants appeal. Reversed, and suit dismissed.

Farrar, Jonas, Goldsborough & Goldberg and Caffery, Quintero, Gidiere & Brumby, for appellants. Dupre & Dupre and James J. McLoughlin, for appellee.

PROVOSTY, J. Plaintiff, an insurance adjuster, adjusted the loss of the Dreyfous fire for the Prussian National Insurance Company, the Commerce Insurance Company, the Balkan and Bulgaria Insurance Company, represented by E. T. Marshall & Co., the Queen City Insurance Company, and the Eastern Fire Insurance Company. The adjustment was conditional. It fixed the loss at $240,000, but on the condition that, in

the event the adjustment for the other insurance companies interested in the fire was at a less figure, the insured should reimburse the above-named companies the difference between the two adjustments. The New Orleans Adjustment Company, one of the defendants in this case, through its president, Wm. A. Cooke, the other defendant in the case, adjusted the loss for these other companies at $62,000 less than the $240,000 at which plaintiff had adjusted for the above-named companies, but succeeded in doing so only after somewhat expensive litigation. The insured having made reimbursement to the above-named companies, as agreed upon, and these companies having, in consequence, benefited that much from the expenses incurred in the litigation, as the result of which the lower adjustment was secured, the defendant Cooke, in his own name and that of his company, wrote letters to the companies represented by the plaintiff, calling upon them, as a matter of fairness, to contribute their pro rata share of these expenses. In the course of this correspondence the following letters were written:

"May 13/1909.
"Prussian National Ins. Co., Chicago, Ill.
"Gentlemen—Dreyfous Co. Ltd., Suit:

"Acknowledging receipt of your favor of the 7th ulto., we beg leave to say that, in the light of the facts, your position is to us remarkable. The incompetency and reprehensible conduct of your representative in agreeing to settle with the assured on the basis of $240,000, his companies to be reimbursed for the overpayment in event that we adjusted the loss at a less figure, has much to do with forcing litigation. Without his meddling we would probably have settled the claim long ago for about $190,000, without litigation and at much less expense.

"Inasmuch as you get the benefit of our work done for your confrères we fail to see where you would violate any ethics of the business in paying your share of the expenses.

"In years gone by we did a good deal of work for you, and your attitude in the instant case is at variance with our recollection of your methods.

"We return the bill with request that you let us have cheque for the amount, and so oblige,
"Yours respectfully,
"Wm. A. Cooke, President."

"May 13/1909.
"Commerce Insurance Co., Albany, N. Y.
"Gentlemen—Dreyfous Co. Ltd., Suit:

"Replying to your esteemed favor of the 9th ulto., we beg leave to request that you please be good enough to advise us whether you have received from the Dreyfous Co. Ltd. your share of the difference between the amount that your representative agreed to settle for and the result obtained by us after litigation.

"But for your representative having been on the loss we would probably have disposed of the claim for about $190,000 long ago, and at much less expense without litigation. It is just such tyros and incompetents that make insurance companies the laughing-stock of thinking business people.

"That you have been benefited by the position we took for the companies that we represent is an established fact.
"Yours very truly,
"W. A. Cooke, President."

"May 13/1909.
"Messrs. E. T. Marshall & Co., No. 189 La Salle St., Chicago, Ill.
"Gentlemen:

"Replying to your favor of the 3rd inst., we beg to return herewith bills against the Balkan National and Bulgaria Insurance Companies.

"We have not before us copy of our respects to you of the 27th of June last past, but nothing therein contained could, in our humble opinion, justify your declining to pay your share of the actual expenses incurred in reducing the claim about $62,000.

"The adjustment company that you refer to as having given very thorough and careful attention to the claim were guilty of the despicable conduct of agreeing with the insured to settle on the basis of $240,000 with the understanding that, if settlement was made with this office for a less figure, your companies were to be reimbursed for the difference. Had it not been for the unprofessional and silly conduct of these tyros, who are incapable of properly protecting companies' interests, we would probably have long ago disposed of this loss without litigation for about $190,000, and at a very much less expense to the companies who endeavored to defend their rights.

"We think that, upon a careful review of the situation, you will not hesitate to send us check for the enclosed bills, which do not include any fee.
"Yours very truly,
"Wm. A. Cooke, President."

"13 May, 1909.
"Queen City Insurance Co., Sioux Falls, S. D.
"Gentlemen—Dreyfous Co. Ltd., Suit:

"We beg leave to ask that you please advise us whether you have ever received cheque from the Dreyfous Co. Ltd., for the difference between the amount your representative allowed

the assured and the amount that we finally disposed of the claim for.

"It is just such conduct as Mr. Richardson was guilty of that spurs unworthy claimants to litigation. Without his reprehensible agreement we would have probably disposed of this loss for about $190,000 long ago, at much less expense and without litigation.

"We shall be pleased to receive cheque from you for the bill sent you on the 30th of March.

"Yours very truly,
    "N. O. Adjust. Co.,
    "[Signed] W. A. Cooke, President."

               "13 May, 1909.

"Eastern Fire Insurance Co., Atlantic City, N. J.

"Gentlemen—Dreyfous Co. Ltd., Suit:

"Replying to your favor of the 12th ulto., we return herewith bill, which you will observe does not include any fee charge. That your company received the benefit of our labors is beyond question, and, therefore, in all fairness, you should contribute to reduce the expense ratio of your confrères on the loss.

"We are under the impression that Mr. Richardson acted for you, and it is remarkable to us that you should approve of his conduct in making a qualified settlement with the assured on the basis of $240,000, with the understanding that his companies were to be reimbursed should a settlement be made with the companies that we represented for a less figure. But for his reprehensible conduct we would probably have long ago closed the loss for about $190,000 at much less expense.

"When we refuse to affiliate with people styling themselves adjusters you may rest satisfied we have excellent reason for so doing.

"We make no doubt that upon reflection you will have pleasure in sending us cheque for the inclosed bill, all of which will go to reimburse the companies who made the fight that benefited you.

"Yours very truly,
    "N. O. Adjust. Co.,
    "[Signed] W. A. Cooke,
             "President."

              "20 May, 1909.

"Commerce Insurance Co., Albany, N. Y.

"Gentlemen—Dreyfous Co. Ltd., Suit:

"Replying to your favor of 17th inst., we beg to say that, had you liquidated the bill sent you, every cent of the proceeds would have gone to the credit of the companies that made the fight, for the good of the business, your confrères on the loss, and we fail to see how you or any one else can indorse the action of your representative, whose conduct is condemned by all who were fortunate enough not to intrust their interests to his care.

"N. O. Adjust. Co.,
    "[Signed] Wm. A. Cooke,     President."

              "9 June, 1909.

"Commerce Insurance Co., Albany, N. Y.

"Gentlemen—Dreyfous Co. Ltd., Matter:

"Since writing you on the 20th ulto., it has been brought to my attention that we paid $45, the fee charged by a party here employed to go over the Dreyfous books by Mr. Richardson, Mr. Campbell, Mr. Bourne, and maybe others, and on which they base their conclusions in copy of letter of 24th December and two letters of 25th September, last past, to Messrs. Whilden & Hancock (herewith inclosed), and we suspect that you received similar remarkable communications. The correspondence, to us, smacks very much of inspiration from assured's attorney.

"If Mr. Richardson had not been young and inexperienced we do not think he would have written the letters that he did to Messrs. Whilden & Hancock. A competent adjuster, we opine, should rely on his own, and not on other adjusters' figures to make settlements.

"Yours respectfully,
    "[Signed]      Wm. A. Cooke."

             "27 June, 1908.

"Messrs. E. T. Marshall & Co., No. 470 Calumet Bldg., Chicago, Ill.

"Gentlemen—Loss Dreyfous Co. Ltd.:

"Replying to your favor of the 20th inst., we beg to say that we did not observe the article in the Field of the 4th inst., to which you refer, but wish to inform you of the fact that we are not 'associated' (nor do we affiliate) with any other adjustment company.

"We represent, practically, all of the leading fire insurance companies doing business in this section, and find that we get better results by paddling our own canoe. We are not 'ambulance chasers,' and do not solicit business. We stand by our record, and do not propose to be pestered by incompetent tyros styling themselves adjusters.

"Any losses entrusted to us will be properly cared for.

"Yours respectfully,
    "Wm. A. Cooke,      President."

Plaintiff alleges that in these communications he is referred to as "an incompetent tyro," "an ambulance chaser," as one "guilty of incompetency and reprehensible conduct," and as "an incompetent tyro, styling himself as adjuster," and as "it is just such tyros and incompetents that make insurance companies the laughing-stock of thinking business people," and as "had it not been for the unprofessional and silly conduct of these tyros, who are incapable of properly protecting the companies' interest, we would have

probably long ago disposed of this loss without litigation;" and that, by reason of these libelous communications, he has been damaged, in loss of business and loss of the confidence, esteem, and patronage of his former employers, in the sum of $10,000, and he prays judgment against the defendants accordingly.

The defense is that these letters were privileged communications, written in due course of defendant's business; that the charge that plaintiff is called "an ambulance chaser" in these letters is untrue; that the language used in said letters is not libelous, but merely defendant's opinion of the intelligence, capacity and conduct of plaintiff on the occasion in question.

The only evidence in the case consists of the foregoing letters, and the testimony of plaintiff's partner in business to the effect that it was plaintiff who adjusted the loss for the above-named companies.

The case was tried by jury, resulting in a verdict for the full amount claimed, $10,000; which, by remittitur, was reduced to $2,100; and defendants have appealed.

[1] We think the communications were privileged, the privilege being what is known as "qualified privilege," which is defined by Odgers on Libel and Slander, p. 264 (4th Ed.) as existing

—"where the defendant has an interest in the subject-matter of the communication, and the person to whom the communication is made has a corresponding interest, or some duty in connection with the matter."

This question of qualified privilege received full consideration in a very late decision of the New York Court of Appeals, in the Matter of Ashcroft v. Hammond, 197 N. Y. 488, 90 N. E. 1117, decided in February, 1910, where Chief Justice Cullen said:

"That presumptively the defendant's telegram was privileged is entirely clear, and the question was one for determination by the court, as the circumstances were not in dispute. Lovell v. Houghton, 116 N. Y. 520 [22 N. E. 1066, 6 L. R. A. 363]."

The definition of a privileged communication given by Judge Folger, in Klinck v. Colby, 46 N. Y. 427, 433, 7 Am. Rep. 360, and reiterated in all decisions on the subject since, is:

"When a communication is fairly made by a person in the discharge of some private or public duty, legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned."

The learned judge further said:

"A written communication between private persons concerning their own affairs is prima facie privileged. And though all that is said is under mistake, yet the words are not for that reason alone actionable. Where both the party making and the party receiving the communication have an interest in it, it has never been doubted that it was privileged."

Newell on Slander and Libel (2d Ed.) p. 389, has the following:

"Qualified privilege exists in a much larger number of cases. It extends to all communications made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation."

Again (section 2, p. 389):

"The proper meaning of a privileged communication is only this: That the occasion on which the communication was made rebuts the inference of malice prima facie arising from a statement prejudicial to the character of the plaintiff, and puts upon him the burden of proving that there was malice. In short, that the defendant was actuated by motives of personal spite or ill will, independent of the occasion on which the communication was made."

To the same effect is the jurisprudence of this court. Buisson v. Huard, 106 La. 768, 31 South. 293, 56 L. R. A. 296.

[2] We agree with defendant that there is nothing to show that the expression, "We are not ambulance chasers," made use of in the letter of June 27, 1908, to Messrs. E. T. Marshall & Co., had reference to the plaintiff. The letter has to speak for itself on that point, and it does not necessarily carry that implication.

The communications were written in due course of defendant's business. Mr. Cooke

was seeking to deduce a pecuniary responsibility on the part of his addressees. He was arguing with them on a proposition which concerned them both. The only question must therefore be whether he exceeded his privilege. From 25 Cyc. 386, we take the following:

"In some of the authorities the rule is stated that, where the party exceeds his privilege, and the communication complained of goes beyond what the occasion demands that he should publish, and is unnecessarily defamatory of plaintiff, he will not be protected, and the fact that a duty, a common interest, or a conditional relation existed to a limited degree is not a defense, even though he acted in good faith. On the other hand, it has been held that expressions in excess of what the occasion warrants do not per se take away the privilege, although such excess may be evidence of malice for the consideration of the jury."

The ground upon which the pecuniary responsibility of the addressees was sought to be deduced was their having employed an incompetent agent, and thereby contributed in bringing on the necessity for the litigation in which the expenses in question were incurred. The competency or incompetency of plaintiff was therefore pertinent to the discussion, and as a consequence reference to it was within the privilege.

There can be no denying that the language used in the statement or development of the argument was rather vivid; but, if forcible terms appeared to Mr. Cooke to be called for by the occasion, the employment of them would not be an abuse of the privilege, but merely the natural expression of honest thought. And we can imagine that to an adjuster the settlement of a fire loss at $240,-000, when the figure should not at most have exceeded $190,000, may appear to be a performance not to be characterized in mild language.

In considering whether the use of the expressions found in these letters is an indication of malice, some allowance must also be made for the irritation which Mr. Cooke had evidently experienced at plaintiff's having made the settlement in question. This settlement handicapped him in two ways. It furnished the assured an argument for a higher figure, and it imposed upon him the task of reducing the figure, not only of the settlement which he was endeavoring to make for his own companies, but also of that which plaintiff had made for his companies. The adjustment was a thorn in his side, not only for having been made at too high a figure, but also for having been made conditional upon his own adjustment. Moreover, it must be admitted that for an adjuster to make an adjustment conditional upon a lower adjustment being made by some other adjuster is out of line. An adjuster represents to some extent both the insured and the insurer; it is his duty to find out the loss and to fix it, and to advise the payment of the amount found. Hence for him to say to an assured, "I fix your loss and the amount to be paid you at $240,000, but if any other adjuster finds a less loss, and you acquiesce in that finding, then the loss which I fix is to be reduced to the same sum," shows either that he does not know his business, or that he has not made a proper investigation to enable him to adjust the loss, or that he is putting improper conditions on the assured, or that he is making the companies pay provisionally more than they ought to pay.

The question is not as to whether plaintiff was competent or not, or his conduct was reprehensible or not, but as to whether the expressions used by defendants with regard thereto were so unjustified and uncalled for as to show malice. We are not prepared to say that they were. They may well have been nothing more than the honest thought, finding expression in suitable terms.

If a doctor had cut off a man's leg with a common butcher knife and a carpenter's chisel, without the use of antiseptics or surgical instruments, and the man had died, and relatives of the man, in referring to this surgical operation in some letters, charged

the doctor, in rather strong terms, with either incompetency or worse, would there be a libel? Evidently not. Well, the adjustment made by the plaintiff may have appeared to Mr. Cooke to be a performance just as gross and calling for expressions just as strong in the qualification of it. Whether it was really so or not is immaterial. The only question is as to the good faith of Mr. Cooke in viewing it and qualifying it as he did.

Judgment set aside, and suit dismissed, at cost of plaintiff.

SOMMERVILLE, J., takes no part herein.