175 So. 605

**WALSH v. BERTEL.**

No. 34053.

June 21, 1937.

Rehearing Denied July 8, 1937.

Philip S. Pugh, Jr., of New Orleans, for appellant.

Richard B. Montgomery, Jr., and L. F. Daspit, both of New Orleans, for appellee.

O'NIELL, Chief Justice.

This is a suit for damages for slander. The plaintiff claims $25,000. He obtained judgment for $500. The defendant has appealed, and the plaintiff, answering the appeal, asks for the amount sued for.

At the time of the occurrences which brought about this suit, Peter Walsh, who is the plaintiff, was a licensed cotton weigher, employed at the cotton warehouse, conducted by the Board of Commissioners of the Port of New Orleans—called the dock board. Charles A. Bertel, who is the defendant in the suit, was then assistant superintendent of the cotton warehouse. According to the prevailing system or arrangement between the dock board and the New Orleans Cotton Exchange, cotton weighers are granted licenses by the cotton exchange, and no one can be employed as a weigher at the cotton warehouse without such a license.

In some way, which has never been explained, a quantity of damaged cotton got into a bale that was being reconditioned, under the supervision of a weigher named Falcon, at the cotton warehouse. Walsh, who was in the warehouse, but had nothing to do with the reconditioning or weighing of the bale of cotton, observed the damaged cotton in the bale as it was going through

the press. Walsh, as a witness in this case, testified that, while he was observing the damaged cotton in the bale, Falcon came up from behind him and tapped him on the shoulder and said that that bale was not to be weighed. Walsh testified that Falcon's conduct in that respect aroused his suspicion that some wrong—meaning some deliberate wrong—was being committed in the leaving of the damaged cotton in the bale. Falcon, as a witness in the case, denied that he told Walsh that the bale of cotton was not to be weighed, and denied that he knew that there was damaged cotton in the bale when it went through the press. This bale of cotton was one of three bales that had been submerged in the river and dried out and reconditioned, as an experiment, at the request of the American Underwriters, to ascertain how much water would be absorbed by the submergence of a bale of cotton for a given time. We do not know what significance should be given to Falcon's telling Walsh that the bale of cotton was not to be weighed, if Falcon told Walsh that; but the dispute between the witnesses became a matter of importance because the question arose afterwards as to whether Falcon or Walsh was to be blamed for allowing the damaged cotton to remain in the bale. Walsh did not report the matter to the superintendent of the cotton warehouse, but made a memorandum of the tag number on the bale, as soon as it was compressed. When it was thrown out in front of the press, the man in charge of the compresses came along and, observing that the bale was longer than a standard bale, ordered it back into the press, and when it came out again it was about the shape of a standard bale, but was minus the tag. All of this is according to a written statement made by Walsh to the chairman of the supervision and deliveries committee of the cotton exchange on the next day after the committee had recommended that his license should be revoked. Walsh said, in his written statement to the chairman of the committee, that he (Walsh) confirmed his "suspicions about the bale" when he learned, on the next day, or perhaps on the second day, after the bale was compressed, that it had been sold and delivered shipside in a lot of cotton that was sold to a foreign firm. Walsh says that meanwhile he had been very busy, and that as soon as he learned that the bale of cotton had gone to the wharf he informed two supervisors, representing the cotton exchange at the cotton warehouse, namely, De Russy and Crawford—and perhaps notified also the chief supervisor—of what he had observed, and requested the supervisors to withhold the source of their information and have the bale of cotton examined. Soon afterwards, on the same day, a representative of the firm that had sold the cotton to the foreign firm notified the assistant superintendent of the cotton warehouse that a representative of the foreign firm had been informed that one of the bales of cotton that had been delivered on the wharf contained damaged cotton. The superintendent or assistant superintendent of the warehouse had the bale of cotton brought back to the warehouse for investigation, and upon its being broken open it was found to contain the quantity

of damaged cotton that Walsh had said it contained. Meanwhile, the superintendent and assistant superintendent of the cotton warehouse were not informed as to who had reported that the bale contained damaged cotton, and did not know that Walsh had had anything to do with the matter. The supervisors, representing the cotton exchange, however, had reported the matter to the cotton exchange; and a committee, known as the supervision and deliveries committee, which, as we understand, is a standing committee appointed by the members or directors of the cotton exchange, decided to make a thorough investigation, to ascertain whose fault it was that the damaged cotton was in the bale. Accordingly, a meeting of the committee was called for the purpose of questioning witnesses, and of hearing what Walsh and Falcon and the supervisor, Crawford, had to say on the subject. There were present at the meeting the president of the cotton exchange, the superintendent and the assistant superintendent of the cotton warehouse, and a representative of the firm that had sold the cotton, and a representative also of the foreign firm that had bought the cotton. All of these men who attended the meeting took part in the questioning of the witnesses. The three men who were liable to be blamed in the matter, namely, Walsh, Falcon and Crawford, were summoned and appeared before the committee, and each one of them made a statement to the committee of his connection with the matter. After hearing the testimony and the statements of the three parties concerned, the committee concluded to recommend to the board of directors of the cotton exchange that the weigher's license of Walsh, of Falcon and of Crawford, should be revoked. The assistant superintendent, Bertel, who is the defendant in this suit, and who attended the committee meeting, took part in the questioning of the witnesses, but did not testify or make any report on the subject under investigation. Five days later the committee held another meeting, which was attended by Walsh, Falcon and Crawford; and each one of them was called into the committee room and was told by the chairman that the committee had decided to recommend to the board of directors of the cotton exchange that his license as a cotton weigher should be revoked, because of his negligence, or neglect, in the matter which the committee had had under investigation. The chairman then suggested to each one of the three weighers that he might make any statement that he might see fit to make in vindication of himself. Each one of them made a statement tending to justify his conduct in the matter; and the committee then heard testimony similar to that which had been heard at the former meeting. The assistant superintendent, Bertel, was the last witness to testify before the meeting adjourned. All other witnesses had been excused and retired from the room. Bertel was questioned by the chairman of the committee, and, in answer to the third question, he proceeded to make a narrative statement, of considerable length, in which he exonorated Falcon and Crawford, and put all of the blame upon Walsh, for failing to notify either the superintendent or the assistant superintendent—

and for his delay in notifying the supervisors for the cotton exchange—of the damaged cotton in the bale which had caused all of the trouble. The statement which Bertel made to the committee, concerning Walsh, is the basis of this suit for damages for libel. The committee afterwards recommended to the board of directors of the cotton exchange that Walsh's license should be revoked, and that Falcon should be suspended for a brief period, but that no penalty should be imposed upon Crawford.

Thereafter, Walsh addressed a letter to the board of directors of the cotton exchange, complaining that he had been condemned without the bringing of any charges of misconduct against him, and without having an opportunity to summon witnesses in his defense, or an opportunity to be confronted by, or to cross-examine, the witnesses who testified against him; hence he asked that the case against him should be reopened in order that formal charges might be brought against him, and that he might have an opportunity to properly defend himself. The board of directors granted the request, and adopted a resolution, directing the committee on supervision and deliveries to reopen the case, and to sit as a court of inquiry, in order that written charges might be preferred against Walsh, and that he might be allowed to summon witnesses in his defense, and have an opportunity to cross-examine any witness or witnesses who might testify against him. Thereupon, the superintendent of the cotton warehouse filed written charges against Walsh, charging (1) that he had permitted the bale of cotton in question to be compressed when he knew that it contained damaged cotton, and when he suspected that some wrong was being committed, and knew that it was his duty and was the custom of the cotton weighers employed in the warehouse to stop the compression of any bale of cotton in a damaged condition; (2) that he delayed for a day or more—and until the bale of cotton had left the warehouse—the giving of the information that the bale contained damaged cotton, notwithstanding the cotton exchange supervisors were on duty constantly and were available at all times; (3) that he withheld his information from the men intrusted with the management of the warehouse, when it was his duty to furnish them the information immediately; (4) that, when he gave the information to the chief supervisor, he gave it at night, by telephone, with the request that his name be withheld in connection with the matter; and (5) that he claimed that the weigher, Falcon, at the time when the bale of cotton was being compressed, tapped him on the back and said that the bale was not to be weighed, which statement on the part of Walsh was denied by Falcon.

The committee sent a copy of the accusations to Mr. Walsh, and notified him of the date on which the committee would meet as a court of inquiry. Thereafter at the request of Mr. Walsh the date of the meeting was postponed. The committee then met as a court of inquiry, and heard testimony on both sides, and allowed Mr. Walsh to cross-examine the witnesses who testified against him; and, at the conclusion of the session, the committee adopted

and forwarded to the board of directors of the cotton exchange a resolution, setting forth all of the proceedings in the case, and concluding thus:

"Resolved that in the opinion of this committee the charges against Mr. Peter Walsh have been sustained and are admitted, and that this committee recommends that the license of Peter Walsh as weigher be and remain cancelled."

The board of directors of the cotton exchange then met and adopted a resolution, setting forth all of the proceedings that had been had in the case, and approving the recommendation of the committee on supervision and deliveries, and finally resolving that Walsh's license as a cotton weigher should remain cancelled..

It is charged in the plaintiff's petition that the derogatory statements which Bertel made against Walsh, to the committee on supervision and deliveries, were made at the first meeting and repeated at the second meeting of the committee. But that is a mistake. Bertel did not testify or make a report to the committee at the first meeting. It is alleged also in the petition that, at the second meeting, Bertel did not make his statement as a witness, answering questions, while the committee was in session, but went out of his way to indulge in the criticism of Walsh after the meeting had adjourned. That also is a mistake. Bertel was summoned before the committee, and gave his statement as a witness, answering questions; and the stenographic report which was made during the proceedings shows that the meeting

adjourned after Bertel had completed his statement.

That part of Bertel's statement to the committee which the plaintiff complains of particularly is as follows:

"Mr. Walsh's attitude towards the cotton warehouse, his attitude towards the cotton exchange, his attitude towards the supervision department, has been always very, very antagonistic. So much so that during the installment of the sampling and weighing system by Mr. Rankin and Mr. Finke certain members of the cotton exchange had to fear for their safety. We had known for years of the improper methods of weighing cotton, and we worked with the cotton exchange in putting a stop to them."

It is charged in the petition that Bertel's statements to the committe conveyed the impression, directly or by necessary implication, that Walsh had been guilty of dishonest methods of weighing cotton, and had stood for dishonest methods of weighing, and hence that Walsh was dishonest. But the connection in which Bertel's statement about dishonest methods of weighing was made, which was well known to the committee and to all persons present at the meeting of the committee, shows that there was no reflection upon the honesty of Mr. Walsh. A few years ago, the cotton exchange, with the cooperation of the managers of the cotton warehouse, changed the system or method of weighing cotton. According to the old system, every time a lot of cotton was sold, even though it remained in the

warehouse, two weighers—one representing the seller and the other representing the buyer—weighed the cotton. The system was expensive to the dealers, and was not satisfactory, because, for lack of attention on the part of one or the other of the weighers—and possibly for other causes—there were frequent complaints of discrepancies in the weights. Under the new system, the cotton is weighed only once, and by a weigher licensed by the cotton exchange; and a record is made and kept of the weight of every bale of cotton in the warehouse, which weight is accepted as the correct weight every time the bale of cotton is sold. This new system, of course, has lessened the demand for the services of cotton weighers, and has reduced proportionately their emoluments. The old-time weighers, very naturally, and perhaps generally in good faith, opposed the innovation. Walsh, no doubt in good faith, was an opponent of the new system. He did not believe that it was conducive to accuracy or fair dealing; and he was outspoken in his opposition to the new system. That is what Bertel had reference to when he said that Walsh's attitude towards the advocates of the new system was very, very antagonistic. It may be that there was some exaggeration in Bertel's statement that Walsh's antagonism was so manifest during the inauguration of the new system of weighing that some of the members of the cotton exchange had to fear for their safety. But certainly there was nothing worse than exaggeration in Bertel's statement in that respect. He had had a personal difficulty with Walsh. The chief supervisor, as a witness in this case, testified that Walsh had threatened him and provoked a quarrel which, but for the intervention of three other men in the warehouse, would have resulted in a fight. Another weigher testified that the vocabulary which Walsh employed at times was such that he (the other weigher) asked to be not assigned to work with Walsh. We mention these incidents merely to show that Bertel, though possibly mistaken, was in good faith when he said that Walsh was so antagonistic towards the cotton exchange that some of its members were afraid of him. Be it said to the credit of Mr. Walsh that other witnesses vouched for his good character and reputation. But, when a witness testifies before a judicial or quasi judicial tribunal, his testimony, if relevant, and if given in good faith, cannot be characterized as a libel merely because it is an exaggeration—or even though it is not true. Information given in good faith, in the performance of a legal, moral or social duty, on a subject in which the party giving the information has an interest, if given to a party having a corresponding duty or interest, is qualifiedly privileged. Newell on Slander and Libel (3d Ed.) p. 475; Buisson v. Huard, 106 La. 768, 31 So. 293, 56 L.R.A. 296; Richardson v. Cooke, 129 La. 365, 56 So. 318; Bayliss v. Grand Lodge of Louisiana, 131 La. 579, 59 So. 996; McGee v. Collins, 156 La. 291, 100 So. 430, 34 A.L.R. 336; Oakes v. Walther, 179 La. 365, 154 So. 26.

The judge who tried this case stated in his reasons for judgment that Bertel's statement to the investigating committee

would have been qualifiedly privileged, and hence not the basis for a suit for libel, ·if the statement had been made by Bertel as a witness before the committèe; but the judge found, from a statement made ·by Bertel as a witness in this case, that he volunteered the criticism of Walsh after the committee had adjourned. Bertel did say, in his testimony in this case, that it was "at the conclusion of the meeting" and .at the suggestion of the warehouse superintendent, who was present at the meeting, that he (Bertel) made a plea for Falcon and Crawford. Obviously, what Bertel meant when he said that his statement was made "at ·the conclusion of the meeting" was that his statement was itself the conclusion of the meeting. That fact is shown by the stenographic record of the proceedings, which record was made at the time—and is not contradicted by any evidence.

■ As a matter of fact, the record in this case discloses that Bertel's· testimony before the investigating committee, or his statement to the committee, was not ·the cause—not even a contributing cause—of the revocation of Walsh's license as a cotton weigher. The committee decided to recommend the revocation of the license at the conclusion of its first meeting on the subject, before Bertel had given any testimony or made any statement to the committee on the subject. The record leaves no doubt about that. It is argued on behalf of Walsh that, if Bertel had not made the statement which he made at the second meeting of the committee, the committee might have withdrawn its intention to recommend the revocation of Walsh's license—as the committee did with regard to· Falcon's license and Crawford's license. But the evidence shows that the reason why the committee decided to recommend the revocation of Walsh's license was that he admitted that he saw the damaged cotton in the bale when it went through the press, and that he did not report it·to his superiors, or report it to the supervisors representing the cotton exchange as promptly as he should have reported it. That was, substantially, the sum and substance of the charges that were preferred against Walsh. And the resolution of the committee, which we have quoted, was founded upon the conclusion of the committee that the accusation was not only sustained but admitted. The president of the· cotton exchange, and another member of the exchange, who attended the investigating committee on both occasions, testified that the only reason for the revocation of Walsh's license was his neglect or failure to report the damaged cotton in the bale before it left the warehouse. Whether that was a sufficient cause for the revocation of the license is a matter which we are not concerned with now.

Whatever loss or injury Walsh suffered in consequence of the incidents which culminated in the revocation of his license was caused entirely and solely by the revocation of the license. The record leaves no doubt about that. If Walsh's license had not been revoked he would not have suffered any loss or injury whatever in consequence of what Bertel did or said. And the revocation of the license was not caused—directly or indirectly—by anything that Bertel did or said.

The judgment is set aside and the demand of the plaintiff is rejected at his cost.