LOTTINGER, Judge.
Plaintiff has appealed from a judgment in his favor in the amount of $200.00 and is asking for an increase in quantum. Defendant has answered the appeal and is contesting liability and in the alternative the quantum awarded.
This is a suit for the alleged defamation of plaintiff, Doyle Whittington, and his business resulting from the defendant’s distribution of a certain issue of its publication known as the “Dodge Reports.” The F. W. Dodge Division of the defendant, McGraw-Hill, Inc., publishes the “Dodge Reports,” a daily publication containing the news of design and bidding activity on new construction projects. The publication is circulated only to subscribing firms such as general contractors, subcontractors, and manufacturers and suppliers of building materials. The particular “Dodge Report” which plaintiff claims ridiculed and belittled him and his business identifies plaintiff’s real estate firm as “Shittington-Ban-deries Real Estate.”
The Trial Judge treated the action as one based on Article 2315 of the Louisiana Civil Code and found that plaintiff need prove only fault and resulting embarrass *289 ment to plaintiff. The defendant argues that the Trial Judge should have found the action to be one of defamation and as such should have found the action to be one of defamation and as such should have applied the entire spectrum of the law applicable to such an action, including the qualified privilege accorded communications made in the common interest without malice.
Plaintiff alleges in his petition that during February 1972, defendant defamed him and his business by distributing Dodge Reports which referred to his business as “Shittington-Banderies Real Estate”.
Defendant in its answer denied the allegations of plaintiff petition and further set forth that defendant’s Dodge Report of February 10, 1972, which is the subject of plaintiff’s action for defamation, was a confidential report published and distributed only to a limited number of subscribers thereto having a common interest, and the misspelling of the name of plaintiff’s business firm was a mere inadvertent, typographical error made without any malice whatever, and said report was released also without any malice whatever, despite defendant’s reasonable efforts to proofread such reports and catch any such possible errors before publication.
There is no dispute as to the facts of this case.
The F. W. Dodge Division of McGraw-Hill, Inc. publishes the Dodge Reports and Dodge Bulletins which daily publications contain news of design and bidding activity on construction projects. Specifically, they provide bidding and specifying opportunities to firms who market construction-related products and services through timely identification of new construction projects. Dodge Reports and Dodge Bulletins are confidential publications furnished only to subscribers thereof, including general contractors, subcontractors, and manufacturers and suppliers of building materials.
The Division employs numerous reporters who contact architects, builders and others for items of interest to the subscribers of the Dodge Reports and the Dodge Bulletins. A reporter turns in his report of a new construction project, prepared on the Division’s “Standard Report Blank”, to the particular office in charge of the area in which the project is located. The report is then e.dited, processed through a computer to identify interested customers, and transcribed from the report-form by typewriter to a mimeograph stencil. It is then scanned for any errors by the stencil-ler, mimeographed, folded, sorted and mailed.
Mrs. Viola M. Schaefer has been employed by the Division in its New Orleans office for almost 16 years as a stenciller, that is, a typist who prepares, or cuts, the mimeograph stencils containing the items which constitute the Reports and Bulletins. She attended Soule College in 1936-1937, taking its overall business course, for which she was awarded a certificate upon completion. She worked part time as a Kelly Girl while married, and then started to work for Dodge in 1957. Her typing rate is very fast, as it necessarily has to be to complete all the reports required to be sent out the same day as their receipt.
Dodge’s New Orleans Office has a full-time stenciller, Mrs. Schaefer, who works part-time (that is, from 1:00 to 5:00 PM), and a third girl who fills in from time to time as a stenciller.
Attached to Mrs. Schaefer’s affidavit is a stencil form, which is used for preparing the Dodge Reports (the Dodge Bulletin is cut on a different form of stencil), which Dodge Reports stencil will contain from two to four reports depending on their length. They usually run three to four reports per stencil.
Mrs. Schaefer types, or cuts, an average of 14 or 15 stencils, or about 50 to 55 reports, per day. When a stencil has been cut, it is scanned by affiant for obvious typographical errors.
As stencils are completed by the stencil-lers, they are picked up by one of the men *290 in the mimeograph room to be run off as the Dodge Reports or Dodge Bulletins, as the case may be with the stencils. After one or more stencils have been run off for the Dodge Reports, the mimeographed sheets are cut so that each report is an individual item, and they are separated for distribution to the customers. An average of about 150 separate reports go out each day.
Before the Dodge Reports are transmitted to the customers, they are spot-checked by others in the office for possible errors, and if there should possibly be any — which is very infrequent — the Report is pulled, corrected and rerun. It is physically impossible to check each report at that time and make the publication time schedule.
On February 9, 1972, one of the Dodge reporters prepared a report on the Garden Apartments project in Baton Rouge, Louisiana, which report (No. 585670) was received in the area office in New Orleans on March 10, 1972. The report was edited in the New Orleans office, and a copy of the report, as edited, is annexed to Mr. Kitzerow’s affidavit as “Defendant-1”.
The report was then typed onto a stencil by Mrs. Viola Schaefer. Annexed to Mr. Kitzerow’s affidavit as “Defendant-2”, is the original of the Dodge Report of February 10, 1972, on the Garden Apartments project which was printed using the stencil prepared by Mrs. Schaefer.
In preparing the stencil, Mrs. Schaefer made a typographical error in typing the name “Whittington-Banderies”, and struck the letter “S”, instead of “W”, in the first name. Mr. Whittington’s name was correctly spelled immediately following his company’s name.
The key for the letter “W” and that for the letter “S” are controlled by the same finger — the ring finger on the left hand— and the “W” is immediately above the “S”. Mrs. Schaefer simply hit the wrong key in typing the name of the real estate agency, but correctly hit the “W” key in typing Mr. Whittington’s name. This was a freak instance when there was such a rare typographical error and also a failure to catch it in the scanning and spot-checking processes described hereinabove.
The error was not noticed until brought to the Division’s attention by Mr. Arthur Cobb, Mr. Whittington’s attorney, on March 13, 1972. Dodge received no complaint, or comment adverse to Mr. Whit-tington, or his real estate agency, as a result of the error, from any of its customers to whom the report was sent.
Mrs. Schaefer did not learn of any typographical error in the Report as stencilled until she heard that the attorney for Mr. Whittington was making some sort of claim because the real estate agency’s name has been misspelled.
The report of February 10, 1972, was issued to approximately 560 Dodge Report and Dodge Bulletin customers under contract on that date, most of which firms are located in Metropolitan New Orleans.
A report usually goes out in a Dodge Report and/or Dodge Bulletin only once unless there are any later changes in the project, in which case a revised report is sent out whenever a reporter sends in the information as to the changes.
On July 20, 1972, the New Orleans office received another report on the Garden Apartments project, as a 'result of which the office file copy of the earlier report was revised and edited, which accounts for the several changes in ink shown on the earlier report. The Dodge Report of July 20, 1972 was accordingly published and sent to the Dodge Report subscribers, in which report the name of the real estate agency was spelled correctly.
Mr. Whittington is not a subscriber to the Dodge Reports. It was not until about a month after the report in question was published that he learned of it, when a regular supplier called on him to seek plaintiff's business as usual, and jokingly re *291 ferred to the mistake in plaintiff’s firm name and showed plaintiff the Report. Plaintiff has continued to do business with that supplier and vice versa.
Subsequently, plaintiff received a letter from another supplier in the address of which his firm name was misspelled in the same way as in the Dodge Report of February 10, but his own name was properly spelled, as was also true in the Dodge Report. Plaintiff admittedly did not know whether the address used in that letter was based on the Dodge Report or not. In any event, he started to throw the letter away, but instead, just put it away in his desk, did not respond to it, and refused to give that supplier any business.
He could not recall the name of any other person or any other details of any other instance in which someone referred to the mistake in his firm name.
Plaintiff conceded that he could not adduce any proof whatever that he had lost any business or otherwise suffered any loss as a result of inadvertent misspelling of his firm name in the Dodge Report. To the contrary, he has continued to prosper in his business, and most recently developed the prestigious $70,000,000 Corporate Square project in Baton Rouge. In fact, the only two instances of reference to the misspelling of his name came from two suppliers who were seeking business from him.
As .stated above, the Lower Court treated this case as one based on Article 23IS of the Louisiana Civil Code, whereas the defendant contends that there was no defamation since the plaintiff’s name was correctly spelled in the line which follows immediately after the headnote, that there was no damage and finally, in any event, the alleged defamatory publication is entitled to the protection of the qualified privilege arising from a publication in common interest, and there was no malice whatever on defendant’s part.
We are of the opinion that under the facts of this case the publication is entitled to the protection of a qualified privilege, that the Lower Court was in error and that the judgment rendered should be reversed and plaintiff’s case dismissed.
What is a qualified or conditional privilege?
We find in 50 American Jurisprudence 2d under Libel and Slander in Section 195 on page 698 the following:
“Conditional or qualified privilege is based on public policy. It does not change the actionable quality of the words published, but merely rebuts the inference of malice that is imputed in the absence of privilege, and makes a showing of falsity and actual malice essential to the right of recovery.
A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under the circumstances fairly warranted by the occasion and duty, right or interest. The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a' proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty. The transmitter must have an interest or duty in the subject matter, and the addressee must have a corresponding interest or duty, but such duty may be moral or social, rather than a legal one. The defense of qualified privilege does not extend to a publication to the general public.
In determining whether conditional privilege exists, the nature of the subject, the right, duty, and interests of the parties, the time, place, and circumstances of the occasion, and the nature, *292 character, and extent of the communication should be considered. It has been held that a conditional privilege to reveal information to protect a sufficiently important interest has its origin in, and is governed by, the rule of good sense and customary conduct of people motivated by good will and proper consideration for others, including due consideration for the subject being informed about as well as the recipient being protected.”
For a full discussion on the subject matter we refer you to Sections 19S through 200 of Libel and Slander in SO Am.Jur.2d.
See also Toomer v. Breaux, La.App., 146 So.2d 723, wherein Judge Tate speaking for the Court held:
“On the grounds of public policy, in order to encourage the free communication of views in certain instances, the law recognizes certain communications as privileged and, as such, not within the rules imposing liability for defamation.
In some limited instances, such as in legislative debates, the privilege may be absolute and thus applicable even if the defamatory statement is maliciously made.
In other more numerous instances, a publication enjoys a ‘qualified’ or conditional privilege, applicable if the communication is made (a) in good faith, (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty. This privilege arises from the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate.
Thus, for example, defamatory statements made by a witness to an investigating committee of a trade organization, if relevant and if made in good faith and without malice, enjoy a qualified privilege, even though the statements turn out to be untrue. Walsh v. Bertel, 187 La. 877, 175 So. 605. ‘Information given in good faith, in the performance of a legal, moral or social duty, on a subject in which the party giving the information has an interest, if given to party having a corresponding duty or interest, is qualifiedly privileged.’ 175 So. 609.
However, the scope of a qualified privilege extends to the reasonably necessary use of clerical personnel (as herein) in the transmission of privileged communications, as well as to the incidental publication thereof to employees or associates of either the sender or the receiver, providing such incidental publication is in the usual course of business and is reasonably necessary to effect the communication of the privileged matter to those entitled to receive it. ALI Restatement of Torts, Section 604; 33 Am.Jr. ‘Libel and Slander’, Section 189.”
There is no question or doubt that the communication was made in good faith and without malice. It was likewise made by one having an interest or a right or duty and made to a person having a corresponding interest or duty. It was only furnished to subscribers of the report. We therefore are of the opinion that the alleged defamatory publication is entitled to the protection of the qualified privilege arising from the publication of the report and since no malice has been shown on defendant’s part, the judgment of the Lower Court is hereby reversed and plaintiff’s case is dismissed all at the expense of the plaintiff including the costs of this appeal.
Judgment reversed.
BLANCHE, J., dissents and hands down written reasons.