**Louis Kulesza et al., Appellants, v. The Chicago Daily News, Inc. et al., Appellees.**

**Gen. No. 41,401.**

118

Heard in the second division of this court for the first district at the October term, 1940. Opinion filed July 1, 1941.

HAROLD O. MULKS, of Chicago, for appellants.

BELL, BOYD & MARSHALL, of Chicago, for appellees; THOMAS L. MARSHALL and JAMES P. JOHNSON, both of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

Plaintiffs, representing themselves as the elected officers and persons constituting a committee of the "Elbert R. Robinson Club," brought a libel suit against the Chicago Daily News, Inc., and Frank Knox, its publisher, because of an article that appeared in the Daily News, June 19, 1939. Defendants' motion

to dismiss the complaint was sustained by the court and plaintiffs' appeal from an order dismissing the suit at plaintiffs' costs.

From the salient allegations of the complaint, which cover some 18 pages of the printed abstract, it appears that letters patent from the Commissioner of Patents of the United States had issued to Elbert R. Robinson in 1908, relating to a process for the manufacture of steel; that for the purpose of prosecuting various suits for the infringement of this patent, Robinson had induced some 3,000 persons to advance various sums of money to him, and had in turn promised these persons that they would receive enhanced sums of money from him in consideration of the loans when and if Robinson should be successful in recovering damages for the infringement of his patent; that upon Robinson's death in 1925 those who had made advances to him formed what was called "The Elbert R. Robinson Club of Chicago," for the purpose of determining the appropriate steps to be taken for enforcing their rights in the premises, and they had selected a committee, consisting of plaintiffs, to act for them; that in 1929 the committee brought suit in the U. S. District Court for the Northern District of Illinois for the infringement of Robinson's patent, which was dismissed by Judge WILKERSON in February 1939; that thereafter plaintiff committee held meetings at various times and places in behalf of all the members of the club, for the purpose of discussing the advisability of taking an appeal from the order of dismissal, and they were seeking to raise funds to cover the expense of prosecuting such an appeal; and it is alleged that concerning these meetings, and shortly after one of such meetings, the following article appeared in the Daily News:

"THEY DREAM OF MILLIONS WHILE PAYING TO GHOST.
By Laurin Healy.
" 'The Rev.' Elbert R. Robinson has been in his grave these 15 years, but his dreams of wealth go

marching on among thousands of Chicagoans who still believe they will soon be millionaires through his activities.

" 'Dr.' Robinson, it may be remembered, was once a Nashville Chiropodist, who came to Chicago before the turn of the century and became an inventor, and became known equally well as the South Side's leading 'philanthropist' and as 'The Negro Ponzi.' In 1908 he was given a patent for a process of molding hard and soft steel that is used in the manufacture of railroad car wheels. Soon afterward he launched a dozen suits, against such companies as the American Car & Foundry Co., the Ford Motor Company and the Chicago Surface Lines, alleging infringement of his patents.

"Dr. Robinson was no piker. The smallest of his suits was for $50,000,000. One was for $1,200,000,000. At any rate the sums were too alluring for many of Chicago's Negroes and white people to resist. When 'Dr.' Robinson went around selling 'interests' in his lawsuits, he found ready buyers.

"For $50 Robinson would sign a note saying: 'When suit ends, I promise to pay John Doe $50,000.'

"DROVE GOLD-TRIMMED CAR.

"By 1919 Robinson was reputed to have $500,000. He drove around in an Italian automobile of rakish lines trimmed in gold. His lawsuits were not going so well, but Dr. Robinson did not seem to mind, while they dragged through the federal courts, Dr. Robinson kept on selling 'interests.'

"In 1920 the romantic Negro was sentenced to one to 10 years in prison for operating a confidence game. A month later he was liberated by Gov. Len Small and went back to his court litigations. When the good 'doctor' died in 1924 he had an estate of only $500—exclusive of his nebulous patent rights—which showed how well he shared his wealth.

"But this is not the end of the story. 'Dr.' Robinson's Noteholders still cherish the yellowed paper which tells them that when the suit ends they will have many thousands of dollars. Some of his note-

holders say there are 30,000 such notes existent in Chicago today. And 90 per cent of the holders are optimistic.

"In 1929 no less a statesman than the late James Hamilton Lewis came to the aid of those noteholders and attempted to have Congress extend the mystic patent.

### "WHO OWNS THE PATENT?

"The chief trouble now is that no one group of noteholders has proved clear title to the Robinson patent. Louis Kulesza of 1950 West Potomac street claims to be the rightful heir. Every Sunday morning he holds a meeting of his faithful, hopeful 'Robinson Club' members at the Atlas Hall, on Cortez street east of Ashland avenue, and whips up enthusiasm for pressing the suits.

"Right now the principal litigation is against the American Car and Foundry Company, asking $50,-000,000 for alleged infringement of the Robinson patent. On Feb. 15, 1939, Federal Judge Wilkerson dismissed the bill against the company. Two weeks later he denied a motion to vacate that order. On March 16, 1939, he denied to the plaintiffs, Kulesza and his flock, the leave to file an amended bill.

"But the hopes go marching on nonetheless. Yesterday Mr. Kulesza held another meeting at the Atlas Hall. More than 500 of the faithful kept the tryst. Attorney Newell Mecartney who now represents the plaintiffs, declared that the case would be appealed at the October term of the Circuit Court of Appeals. There were cheers. Mecartney assailed the enemies of the Kulesza group—noteholders who have not joined in the law suit against the foundry company.

"A man from Milwaukee, who said he had spent $179 so far to keep up his note, said: 'United we stand, divided we fall. We must get all the noteholders together to establish the fact that we have clear title.'

### "AND MORE MONEY NEEDED.

"Hopeful Polish-Americans, Negroes and others, who had saved all week to get 14 cents carfare to at-

tend, cheered when speakers said they would get their money. Kulesza spoke in Polish for 10 minutes, urging all to wait and they would be made rich.

"It is not the original cost of the Robinson notes that is expensive, but the upkeep.

" 'We need $1,400 to appeal our case,' said a speaker. His hearers, which have heard that story for lo these 30 years, were not dismayed. As they have many times in the past, they filed up to the front of the hall, signed a petition blank and plunked a dollar on the table.

" 'We'll have the $1,400 by next Sunday,' said a committee member."

The gravamen of the complaint is that plaintiffs, who were officers of the club and members of the committee representing the large body of contributors to the Robinson project, were law abiding citizens, engaged in various lines of business and vocations, all giving their services to the organization gratuitously and exercising their best judgment on behalf of the members of the club, and that defendants in publishing the foregoing article, "wilfully, maliciously and, illegally; designing and contriving to malign and libel the plaintiffs, and to cause it to be falsely believed by the hundreds of thousands of persons who were then and there the readers and subscribers of the Chicago Daily News, that the plaintiffs were dishonest and dishonorable, and were falsely and fraudulently deceiving and misleading the various persons who constituted the membership of said Elbert R. Robinson Club, and were inducing and persuading the persons . . . to advance money to the members of the committee . . . upon the representation, statement and promise that the same was to be used for the purpose of maintaining and conducting a litigation which the said plaintiffs knew to be devoid of merit; and to cause it to be falsely believed by the hundreds of thousands who are the readers and subscribers of

said newspaper so known as 'The Chicago Daily News,' that the plaintiffs, and each of them, were operating and maintaining what is commonly known as a 'racket,' and were falsely, wilfully and intentionally misleading the membership of said Elbert R. Robinson Club, and were collecting large sums of money from said persons through the false and fraudulent representation, that by giving said sums of money said persons would, in all probability, receive therefor great gains, out of said litigation, when the said plaintiffs, and each of them knew, that there was no possibility of any of said persons recovering anything by said litigation; . . . and to cause the plaintiffs to be considered and regarded by intelligent citizens, as dishonest and disreputable persons, who obtained and procured money from other persons by false and fraudulent representations. . . . ''

Plaintiffs set forth some eight separate propositions by which they seek to reverse the order from which the appeal is prosecuted, but their principal contention may be briefly stated as follows: If the language claimed to be libelous is susceptible of two or more constructions, one of which renders it libelous and the other not, and defendants join issue, then the meaning of the language becomes a question of fact for the jury; but where defendants move to strike, they admit by doing so that the language is susceptible of the meaning attributed thereto by plaintiffs in their complaint, and consequently the granting of the motion to strike the complaint constituted error.

It is evident from a reading of the article that this was a newspaper's description of a campaign for the solicitation of money, and that the subject matter of the article constituted matter of public interest and concern, which under the current weight of authority is legitimate subject of criticism and comment by a newspaper, so long as it does so fairly and with an honest purpose. ''Such comments or criticisms are not

libelous, however severe in their terms, unless they are written maliciously.'' (17 Ruling Case Law, Libel & Slander, sec. 100, p. 352.) The evident purpose of the public gatherings sponsored by the members of the club and conducted by plaintiffs was to enlist further and continued support for the infringement suits and to get new and additional contributions. The conduct of the litigation had long been a matter of public interest, and was therefore the subject of legitimate criticism and comment by the press.

It may well be true, as is pointed out by defendants, that some of the ''unfortunate note holders,'' after reading the article, gave more careful and intelligent consideration than theretofore to the pouring of their savings into this project, and it was not amiss for a newspaper to point out to the uninformed element of the population the pertinent facts of the enterprise. The attention of the Daily News was called to the situation by reason of public hearings that were being held at the time, in which noteholders were being urged to invest more money in what was undoubtedly a hazardous undertaking, since the litigation had been dismissed by the U. S. District Court, and the newspaper committed no libel upon the committee in printing its comments on the project. In so doing, no attack was made upon the individuals who sponsored the enterprise, and neither plaintiff committee nor the noteholder group were charged with perpetrating a fraud; the article merely commented upon the history of the litigation and its recently unsuccessful termination before Judge WILKERSON, together with an implication that investors would probably lose their hard-earned savings and that the time had come when not too many gullible persons should continue to join in supporting the cause with their contributions. In *Williams v. Chicago Herald Co.*, 46 Ill. App. 655, the court in commenting upon a newspaper's description of a campaign for the solicitation of money, which

was charged to be libelous, said (p. 665): "We cannot treat seriously, and thereby give a sort of dignity to the claim of the appellant to damages, for a publication, the tendency of which was simply to warn gullible fools against loss."

None of the plaintiffs (except Kulesza) was named in the article, and there is no allegation that Kulesza and his coplaintiffs were injured, since in their public meetings they were able to convince noteholders to continue, after both sides of the project had been considered.

With reference to plaintiffs' principal contention that the motion to dismiss should not have been allowed, since it admitted that the language of the article was susceptible of the meaning attributed to it by plaintiffs in their complaint, the law is well settled that a motion to dismiss will be sustained if the words claimed to be libelous are not reasonably or fairly capable of the construction placed upon them by plaintiffs, and that it is for the court to decide whether the publication was reasonably capable of the meaning ascribed to it in the innuendo. (*Clarkson v. Book Supply Co.,* 170 Ill. App. 86, and numerous cases cited therein.)  See also, *Creitz v. Bennett,* 273 Ill. App. 88; *Payne v. Evening American Pub. Co.,* 267 Ill. App. 610; *Davis v. Ferguson,* 246 Ill. App. 318; *McLean v. Caverne,* 175 Ill. App. 273; *Campbell v. Morris,* 224 Ill. App. 569.

Plaintiffs stress the headline of the article, "They Dream of Millions While Paying to Ghost," as affording a basis for the charge of defamation, but it is fundamental that in judging an article all the article must be considered and read, and that a headline will be read in connection with the language which follows. (*LaGrange Press v. Citizens Pub. Co.,* 252 Ill. App. 482; *Marshall v. Chicago Herald Co.,* 185 Ill. App. 224.)  We think the words in the article upon which this suit is predicated are not reasonably and

fairly susceptible of the charge that the acts of Kulesza and his associates were fraudulent. Defendants argue all through their brief that plaintiffs were merely zealots, trying to sell others to their point of view, although in a most hazardous undertaking for themselves as well as for any who might join them, and we think that the tenor of the article cannot reasonably and fairly be interpreted in any other light.

So far as defendant Knox is concerned the complaint contained no allegation charging him with responsibility for the article; it is merely alleged that the article appeared in the Chicago Daily News, published by defendant Chicago Daily News, Inc., and that Frank Knox was editor and publisher of the paper and supervised and controlled its publication and circulation and directed and controlled the policies of the corporation. There is no allegation in any way connecting him with the article; it is not even charged that he knew of it. Under these circumstances, it is the settled law in this State that "to make an officer of a corporation liable for the negligence of the corporation there must have been upon his part such a breach of duty as contributed to, or helped to bring about, the injury; that is to say, he must be a participant in the wrongful act." (Cyclopedia of the Law of Private Corporations, p. 3773; *Simon v. Pelouze,* 263 Ill. App. 177, 184; *Frorer v. Baker,* 137 Ill. App. 588, 594.)

We think the court properly dismissed the complaint upon the motion made by defendants, and the order or judgment appealed from is affirmed.

*Affirmed.*

SCANLAN and JOHN J. SULLIVAN, JJ., concur.