GOLDEN NORTH AIRWAYS, Inc., a Corporation, Appellant,

v.

TANANA PUBLISHING COMPANY, Inc., a Corporation, Appellee.

No. 13415.

United States Court of Appeals, Ninth Circuit.

Dec. 10, 1954.

Rehearing Denied Jan. 12, 1955.

Warren A. Taylor, Taylor & Boggess, Fairbanks, Alaska, Bassett, Geisness & Vance, Seattle, Wash., for appellant.

Maurice T. Johnson, Hubert A. Gilbert, Fairbanks, Alaska, Richard P. Norton, Maynard Garrison, Wallace, Garrison, Norton & Ray, San Francisco, Cal., for appellee.

Before ORR and POPE, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

The appellant corporation, organized and existing under the laws of the Territory of Alaska, instituted this action in the United States District Court for the Territory of Alaska, Fourth Division, against the appellee, a corporation organized under the laws of the Territory of Alaska, and owner and publisher of the daily newspaper known as the Fairbanks Daily News-Miner, published at Fairbanks, Alaska.

The amended complaint, filed August 11, 1950, charged libel through the publication by the appellee of the article which is printed in the margin.[1]

---

1. "What Kind of Air Carriers Does Alaska Want?

(From the Daily Alaska Empire)

"In Alaska we have heard much criticism of the Civil Aeronautics Board from non-scheduled air carriers. The Board is required by Congress to certificate air carriers to operate scheduled and non-scheduled routes with sufficient frequency to adequately serve the needs of the domestic economy, postal service and national defense.

"The decisions of the Board regarding Alaska carriers show that it favors competition and will certificate two or more carriers for scheduled or non-scheduled service, if the volume of traffic is sufficient so that the revenue from a route will support efficient, safe and economic transportation by more than one carrier. The same policy has been adopted throughout the United States in dealing with carriers by rail and motor coach under similar statutes and similar regu-

The appellant selected the portions of the article which it claimed were written concerning it. The amended complaint recited that the appellees caused to be published in its newspaper "an editorial containing statements concerning all non-scheduled air carriers operating in Alaska, of which the Plaintiff is one, and which as to this Plaintiff were libelous, including the following:

" 'They (referring to all non-scheduled air carriers) are unable to comply with the requirements of financial responsibility, preventive maintenance, inspection, accounting and innumerable other requirements necessary to operate safely, efficiently and enonomically.'
and:

" 'These (referring to all non-scheduled air carriers) non-certificated carriers are generally spending their stockholders' money in operating expenses, running up bills for labor, rent, taxes, etc., which they cannot pay, carrying no in-

latory bodies. It is the American system of confining the traffic to one carrier, or to a very few, until they have developed a volume which permits low fares, frequent service and modern, reliable equipment. Then, and only then, can the public afford to have competition which in any event must be limited to an amount which will not destroy the service then being provided.

"The non-scheduled air carriers, operating sometimes with no authority and often in excess of their authority as to frequency, have utilized cheap war-surplus equipment and a readily available pool of air and ground personnel trained by the Navy and Air Force to get started without adequate financing. They are unable to comply with the requirements of financial responsibility, preventive maintenance, inspection, accounting and the innumerable other requirements necessary to operate safely, efficiently and economically.

"We concur in the Civil Aeronautics Board policy of first requiring adequate service for the economic, postal and defense needs of Alaska and then requiring this service at the lowest fares which will give the operators a fair return on their investment and sufficient incentive to meet the challenge of an expanding industry. We also concur in its policy of permitting competition only when the volume of traffic will permit two or more carriers to give such service at such reasonable fares.

"Some businesses, such as our local telephone, water and electric utilities, must remain non-competitive. It is the duty of the Civil Aeronautics Board to see that non-competitive carriers do furnish adequate service and at reasonable rates. We believe the Civil Aeronautics Board has performed this job very well.

"It has been hampered, however, by public opinion, which in some places has demanded that there be unlimited competition. They have seen fly-by-night operators come to Alaska with freight and

passenger fares, if and when they fly, at rates half as much as are charged by the certificated carriers. These non-certificated carriers are generally spending their stockholders' money in operating expenses, running up bills for labor, rent, taxes, etc., which they cannot pay, carrying no insurance and withdrawing from Alaska in the winter when revenues fall off. What would be the quality and frequency of our winter service if we had only non-scheduled carriers? What will happen to our dependable and reliable carriers if this competition continues? The Civil Aeronautics Board seems reluctant to stop them, but many of them have withdrawn in bankruptcy or forced liquidation.

"Who is paying the loss incurred by Alaska Airlines in taking a load of passengers round-trip to Washington, D.C., for $125.00 so they could testify at the Statehood hearings? The C.A.B. is not paying the loss as all costs for such non-scheduled operations are excluded in computing its mail pay. The stockholders who are foolish enough to allow such nonsense, its creditors in Alaska, and the general public, one way or another, will be struck. The Territorial Treasurer is already on the hook for $22,000 in Veterans' taxes since June 30, 1948, on which Stanley McCutcheon, of Alaska Airlines, has sent 'a token payment' after being threatened by the Attorney General of Alaska with a suit. No air line can pay its bills by charging one-fourth of the regular fare.

"Much of the unjustified criticism of the Civil Aeronautics Board is promoted, encouraged and manufactured by the Alaska Development Board and its member, Herbert Hilscher, who is employed as a public relations man by non-scheduled air carriers. Was the Alaska Development Board created for the benefit of its members? It should be working for the future development of Alaska through safe, reliable, frequent and cheap air transportation."

surance and withdrawing from Alaska in the winter when revenues fall off.' "

Damages in the sum of $50,000.00 was asked.

The selection of these portions of the editorial as the gist of the libel against the appellant has a double significance in this case: (1) As the appellant was not referred to by name, it was necessary that it make itself a part of a small group whose acts were criticized in these portions of the article, and (2) the cause was tried and submitted to the jury upon the theory that appellant was entitled to recover only if the jury found the article referred to the whole group of which the plaintiff was a member.

In its answer, the appellee admitted publication of the editorial and pleaded that the complaint did not state a claim, that the article did not refer to the appellant by name, that, indeed, it did not defame any ascertainable person, and that the article was a fair and impartial comment made in good faith upon a matter of public interest and without malice towards anyone.

Upon the trial of the cause testimony was offered on the part of the appellant that the words "non-scheduled" had acquired a popular meaning and included a small group of not to exceed five or ten companies in Alaska of which they were one. The testimony of the witnesses for the appellee was to the effect that the term has no meaning in aeronautics and that it is broad enough to include large numbers of carriers. Other testimony need not be referred to.

The court instructed the jury that the article was libelous and that the defense of the fair comment had not been proved. Both of these instructions were excepted to. A.C.L.A.1949, § 55–7–121; Copper River & Northwestern Ry. Co. v. Reeder, 9 Cir., 1914, 211 F. 280, 284–286. The Court submitted eight questions to the jury. They, with the answers returned on April 22, 1952, were as follows:

"Question No. 1: In Alaska, on or about the 15th day of May, 1950, did the portion of said editorial, Exhibit A attached to plaintiff's second amended complaint herein, which is in words as follows:

" 'They are unable to comply with the requirements of financial responsibility, preventive maintenance, inspection, accounting and the innumerable other requirements necessary to operate safely, efficiently, and economically.'

" 'These non-certificated carriers are generally spending their stockholders' money in operating expenses, running up bills for labor, rent, taxes, etc., which they cannot pay, carrying no insurance and withdrawing from Alaska in the winter when revenues fall off.'

refer to and mean all air carriers classified as large irregular air carriers operating in Alaska that were certificated and authorized to make non-scheduled flights but did not have a certificate of convenience and necessity authorizing them to make scheduled flights?

"Answer: Yes.

"If you have answered 'Yes' to the last preceding question, then answer the following question: otherwise skip it.

"Question No. 2: Approximately how many of said large irregular air carriers mentioned in the last preceding question were there operating in Alaska at said time?

"Answer: 5–10.

"Question No. 3: In Alaska on or about the 15th day of May, 1950, did the portion of said editorial Exhibit A attached to plaintiff's second amended complaint herein, which is quoted in Question No. 1, refer to and mean all air carriers operating at said time and place that did not have a certificate of convenience and necessity authorizing them to fly regular schedules?

"Answer: No.

"Question No. 4: If you have answered 'Yes' to the last preceding

question, then answer the following question; otherwise skip it, to wit: How many of the air carriers mentioned in the last preceding question and answer were there?

"Answer:

"Question No. 5: In Alaska, on or about the 15th day of May, 1950, did the portion of said editorial, quoted in Question No. 1 hereof, refer to and mean by the words non-certificated or non-scheduled air carriers all air carriers operating in Alaska at said time that did not have a certificate of convenience and necessity and also mean and include all air carriers that did have certificates of convenience and necessity if and when they were making a flight which was not a regularly scheduled flight?

"Answer: No.

"Question No. 6: If you have answered 'Yes' to the last preceding question, then answer the following question; otherwise skip it, to wit: How many of the air carriers mentioned in the last preceding question and answer were there?

"Answer:

"Question No. 7: In Alaska, on or about the 15th day of May, 1950, did the portion of said editorial quoted in Question No. 1 hereof refer to and mean all non-scheduled air carriers operating in Alaska at said time?

"Answer: No.

"Question No. 8: In what sum of money, if any, was plaintiff damaged by reason of said libelous words set forth in Question No. 1 hereof?

"Answer: $25,000.00." *

Each of the parties submitted a proposed judgment. After extended discussions, the court set aside the verdict of the jury and gave judgment in favor of the appellee on May 5, 1952. The basis for its ruling was this:

"When the plaintiff tendered a second amended complaint the main thing they wanted to put in was the fact which comes in the fourth paragraph, in which they said defendant caused to be published in its newspaper an editorial containing statements concerning all non-scheduled air carriers—of which the plaintiff is one, and considerable law was cited showing that that was the law, that if the libelous matter was against a group or a class, if it was a small class, then every person in that class had a cause of action for the libelous matter. With that in mind the plaintiff amended so as to say that the newspaper article concerned the non-scheduled air carriers operating in Alaska, of which the plaintiff is one.

"Now, then, the plaintiff had to prove that. They had to prove that all of the non-scheduled air carriers were mentioned by the libelous article and were intended to be mentioned by the libelous article. So the jury was then asked, so as to get this statement decided, to get them to decide whether there was a small group or class mentioned by the libelous article and whether or not plaintiff was one of them. There wasn't any doubt all the evidence showed that plaintiff was one of them, but the question was whether every one of the non-scheduled air carriers were mentioned. The question to the jury was: did the libelous portion of the editorial refer to and mean all non-scheduled air carriers operating in Alaska at said time? Those were plaintiff's own allegations that it did, that the libel-

---

\* The answer to question No. 8 was, in effect, a general verdict for the plaintiff for damages in the sum of $25,000.00, and called for a judgment for the plaintiff in that amount. Such judgment was not entered because the trial court entered judgment for the defendant upon the ground of inconsistency between the answers to questions No. 7 and No. 8. So, we refer to the answer to question No. 8 as "the general verdict".

ous article did refer to all of the non-scheduled carriers and that they were one of them, including themselves. The jury says no, that didn't refer to all of those carriers, which it seems to me takes away plaintiff's cause of action." (Tr. p. 271.)

This is an appeal from the judgment.

The first question to determine is whether the answer of the jury to Question No. 7 was inconsistent with the award of damages to the appellant under question No. 8.

## I

### General And Special Verdicts

■■■ The law of Alaska recognizes special verdicts and findings on particular questions of fact. A.C.L.A.1949, §§ 55-7-81, 55-7-87. They also specifically provide that where a special finding of fact is inconsistent with the general verdict "the former shall control the latter, and the court shall give judgment accordingly". A.L.C.A.1949, § 55-7-85. This is also the general rule. Rule 49, Federal Rules of Civil Procedure; 53 Am.Jur., Trials, § 1084; Prentice v. Zane's Administrator, 1850, 8 How. 470, 483-484, 12 L.Ed. 1160; Graham v. Bayne, 1855, 18 How. 60, 63, 15 L.Ed. 265; Skidmore v. Baltimore & O. R. Co., 2 Cir., 1948, 167 F.2d 54, 65-70. It is also the rule that if the special verdict or special findings can be reconciled with the general verdict, the court should do so. 53 Am.Jur., Trials, § 1084; Boulger v. Northern Pacific Ry., 1919, 41 N. D. 316, 171 N.W. 632; Welch v. Bauer, 5 Cir., 1951, 186 F.2d 1002. But to our mind, there can be no such reconciliation here. Counsel for appellants at the trial objected to most of the special questions. But he stated that No. 7 was "appropriate".

This is no mere admission. It confirms the fact that the appellant had to bring itself *within the small group* in order to recover. It did so in the complaint and the phrasing of Question No. 7 is identical with the phrasing of the complaint. The negative answer of the jury to that question nullified the award of damages contained in the answer to question No. 8.

In Fields v. Page Trust Co., 1928, 195 N.C. 304, 142 S.E. 7, an action for libel had been instituted against a bank because it returned a check negotiated by the plaintiff with a notation thereon "Signature forged". The jury gave judgment for the plaintiff. However, in answer to a special question it found that the defendant had acted in good faith in placing the notation on the check. The court ruled that the verdict in favor of the plaintiff was properly set aside, as the answer to the special question showed the occasion was privileged and the bank having acted in good faith, there could be no recovery.

The problem in this case must be related to the problem in group libel.

## II

### Group Libels

■■■ A libel directed at a group may form the foundation of an action by an individual if the group is small enough so that a person reading the article may readily identify the person as one of the group. The familiar illustration is that if one should say that the members of a City Council are all corrupt, any member of the Council could, even though not designated by name, sue. However, if the group is so large that there is no likelihood that a reader would understand the article to refer to any particular member of the group, it is not libelous. Restatement, Torts, § 564, comment c (1938); See Gatley on Libel and Slander, 4th Ed., 1953, pp 115-118; 33 Am.Jur., Libel and Slander, § 192; Wilner, The Civil Liability Aspects of Defamation Directed Against a Collectivity, 90 U. of Pa.L.Rev. 414 (1942); Note, Liability for Defamation of a Group, 34 Col.L.Rev. 1322, 1335 (1934); Note, 29 Cal.LawRev. 83 (1940); Philip Wittenberg, Individual Recovery for Defamation of a Group, 1954, 15 Ohio St.L.J., 273-279.

Both sides of this principle are well stated in a California case in which, however, because of the size of the group, the publication was held not libelous. An action was instituted in Los Angeles County as a result of an article published in a Los Angeles newspaper which contained a statement attributed to a state senator who was chairman of a committee investigating pressure groups, and which read:

" 'Californians are rapidly becoming aroused to the folly of taxing citizens to finance Moscow propaganda'. This occurs under the present set-up, he explained, because taxpayers pay the relief bill for the 31,000 Workers' Alliance members and their officials divert their membership dues to further Communist agitation under direct orders from the Third Internationale headquarters in Russia." Noral v. Hearst Publications, Inc., 1940, 40 Cal.App.2d 348, 350, 104 P.2d 860, 861.

The plaintiff alleged that he was the President and chief official of the Workers' Alliance and that the article libeled him by accusing him of sympathy with Communism. The Court held that the group referred to was too large to permit any individual to sue on it:

"An accusation such as that complained of cannot have the quality of a libel unless there be a certainty as to the individuals accused. There is nothing in the published article that makes a personal application to the plaintiff. He cannot by use of the colloquium make the language which is applicable to so large a group of persons be made specifically to refer to him. The reference to 'their officials' who are accused of diverting membership dues to further Communistic agitation applies no more to plaintiff than would a similar statement accusing federal judges of encouraging violations of the import tax laws be made to apply to any one judge. It is no nearer a libel against plaintiff than it would libel the defendant by publishing a declaration that the metropolitan press of California is devoted to the corrupting of public life, lowering moral standards and debauching public officials. Certainly such general language against a class or group of people cannot constitute libel. Where a group is very large and nothing that is said applies in particular to the plaintiff, he cannot recover." Noral v. Hearst Publications, Inc., supra, 40 Cal.App.2d at pages 350–351, 104 P.2d at page 862.

In drawing the distinction between an accusation against small groups which can readily be interpreted as referring to any member thereof and the large groups as to which immunity from libel attaches, the Court said:

"The fact that a number of the cases have authorized recovery by a member of a small group where it was clear that the defamation applied to all of the group does not detract from the doctrine above announced or from the force of the decisions above cited. If a published article of a defamatory nature were to charge that the entire board of supervisors of a particular community, consisting of five members, is corrupt and diverts the public funds to the maintenance of brothels, each member of that board could recover but if a similar article were to charge all the supervisors of the state with corruption, it would not be libelous as against an individual supervisor because the group accused would be too numerous." Noral v. Hearst Publications, Inc., supra, 104 P.2d at page 863.

A good illustration of a libel against a small group which may be actionable as to each of them is a New York case. A newspaper article charged that the New York City Coroner's office was "graft-ridden", and described the methods used by the coroners and their physicians to extort funds from the public. There were four coroners and each had

a physician. The New York Court of Appeals held that one of the physicians could sue, saying:

> "Very likely an article which stated in general terms that all the coroners in the state were a bad and corrupt lot would not be libelous as against some individual who happened to be a member of the office somewhere. Upon the other hand, if an article stated in so many words that every one of the four coroners and of the coroner's physicians at a given time occupying an office in the City of New York was corrupt and took bribes, we apprehend that there would be no serious controversy over the proposition that any one of those individuals might maintain an action. The question here is whether the article complained of is analogous to the first or to the last one * * * and certainly it would be within the province of the jury to give such meaning, construction, and application to the language used as would bring it within the principles, permitting this action to be maintained." Weston v. Commercial Advertiser Ass'n, 1906, 184 N.Y. 479, 485, 77 N.E. 660, 662.

On the other hand, an article which spoke of a "parking-lot racket" in Washington, D. C., was held to be too general to permit the operator of one of the lots to sue. The Court, after reviewing many cases, including the one just analyzed, gave this as the philosophy behind the ruling:

> "The rule thus stated by the courts and text writers represents, undoubtedly, what has been regarded as a sound compromise between the conflicting interests involved in libel cases. On the one hand is the social interest in free press discussion of matters of general concern, and on the other is the individual interest in reputation. The courts have chosen not to limit freedom of public discussion except to prevent harm occasioned by defamatory

statements reasonably susceptible of special application to a given individual." Service Parking Corp. v. Washington Times Co., 1937, 67 App.D.C. 351, 92 F.2d 502, 505–506.

So it is evident that libels against groups consisting of large numbers of persons cannot satisfy the fundamental requirements of the law of libel that a libel shall refer to a person certain and that that person be the person who claims to be libeled—the plaintiff in the action.

### III

### The Contradiction Between The General And Special Verdicts

In the case before us the jury's answer to Question No. 7 was a finding that the article *did not* refer to all the members of the group of which the appellant was one. When this is the situation, no person in the group can bring an action for libel. In Latimer v. Chicago Daily News, 1947, 330 Ill.App. 295, 71 N.E.2d 553, 554, a newspaper article referred to a sedition trial under the title "Capital Sedition Trial Shows True Despicable Nature of Fascism". In the body of the article, the trial was referred to as a trial

> "where the scum of political gangsterdom in this country are represented by as craven a group of lawyers as I've seen, not excluding the nickel and dime shysters who used to hang around the racket court on S. State St. as staff attorneys for the gambling and vice syndicate." 71 N.E.2d at page 554.

The plaintiff brought action for libel. The trial court dismissed the complaint and entered judgment for the defendant. In sustaining the ruling of the court below, the Illinois Court of Appeals held that an article directed against a group but *not against all the members of a group* "does not give plaintiffs a right of action for libel". 71 N.E.2d at page 555. And see, Service Parking Corp. v. Washington Times Co., 1937, 67 App.D.C. 351, 92 F.2d 502; Helmicks v. Stevlingson, 1933, 212 Wis. 614, 615, 250 N.W. 402,

91 A.L.R. 1158; Noral v. Hearst Publications, Inc., 1940, 40 Cal.App.2d 348, 352, 104 P.2d 860.

■ In a case in the Seventh Circuit which also arose under Illinois law, the principle of Latimer v. Chicago Daily News, supra, and others was applied. In that case, the plaintiff, a veterinary surgeon sought to apply to himself an article written on vivisection in general. The Court held that this could not be done, saying:

"Plaintiff's theory seems to be that he is a member of a group of persons—namely, those who participate in and support vivisection, and that any words written of and concerning this group are, in law, written of and concerning the plaintiff. However, such a theory may not be applied unless the *publication can be said with certainty to include every individual within the group.*" Brewer v. Hearst Pub. Co., 7 Cir., 1950, 185 F.2d 846, 848. (Emphasis added.)

The appellant here by its pleading sought to bring itself within a definite group. The court propounded to the jury Question No. 7 embodying the plaintiff's own theory. The jury found that the only libelous statements which the appellant considered the gist of the libel did not refer *to all* the members of the group. In the light of the decisions just cited, such a finding nullifies the general verdict in favor of the appellant. This conclusion would not warrant a judgment for the appellee but for the fact that we are of the view that the article is not libelous and, as appears on its face, was a fair comment upon a matter of public interest and as no recovery could be had under it under any circumstances, we can sustain the judgment in favor of the appellees upon the familiar ground that a reversal would be ineffectual. 5 C.J.S., Appeal and Error, § 1852. See Archer v. United States, 9 Cir., 1954, 217 F.2d 548.

## IV

### Certainty In The Law Of Defamation

The laws of Alaska contain no definition of civil libel, although there is a definition of criminal libel. A.C.L.A. 1949, § 65–4–28. The only provision relating to pleading libel is one which reads:

"In an action for libel or slander it shall not be necessary to state in the complaint any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose, but it shall be sufficient to state generally that the same was published or spoken concerning the plaintiff, and if such allegation be controverted the plaintiff shall be bound to establish on trial that it was so published or spoken." A.C.L.A.1949, § 55–5–13.

■ The appellant sought to comply with this section in the allegation already reproduced at the beginning of this opinion stating that the article was published concerning it. But compliance with such section does not dispense with the necessity of showing that the article conformed to the rule of certainty which requires that in every defamation there be two things: (1) a defamation apparent from the words themselves, for no innuendo can alter the sense, and (2) certainty as to the person defamed, for no innuendo can render certain that which is uncertain. Newell on Slander and Libel, 4th Ed., 1924, § 200; Vedovi v. Watson & Taylor, 1930, 104 Cal.App. 80, 83, 285 P. 418; Williams v. Seiglitz, 1921, 186 Cal. 767, 771, 200 P. 635, 637; Helmicks v. Stevlingson, 1933, 212 Wis. 614, 250 N.W. 402; Note, Sufficiency of Identification of Plaintiff by Publication, 1934, 91 A.L.R. 1161; Yankwich, Certainty In The Law of Defamation, 1954, 1 U.C.L.A.L.Rev. 163, 170–179.

■ The California case just referred to contains a very concise statement of the rule:

"As to the first point, it is necessary that the words should have been published concerning the plaintiff and should have been understood by at least one third person to have concerned him. De Witt v. Wright, 57 Cal. 576; Nidever v. Hall, 67 Cal. 79, 7 P. 136. 'Defamatory words to be actionable must refer to some ascertained or ascertainable person, and that person must be plaintiff (citing Rhodes v. Naglee, 66 Cal. 677 [6 P. 863]; De Witt v. Wright, supra; Skrocki v. Stahl, 14 Cal. App. 1 [110 P. 957]). If the words used really contain no reflection upon any particular individual, no averment can make them defamatory. It is not necessary that plaintiff should be mentioned by name if the words used in describing the person meant, can be shown to have referred to him and to have been so understood (citing Peterson v. Rasmussen, 47 Cal.App. 694 [191 P. 30]).'" Vedovi v. Watson & Taylor, supra, 104 Cal.App. at page 83, 285 P. at page 420.

This is the general rule. The person *to whom* the publication is made must understand to whom it refers. And if the person is not referred to by name or in such manner as to be readily identifiable from the descriptive matter in the publication, extrinsic facts *must be alleged and proved* showing that a third person other than the person libeled understood it to refer to him. Restatement, Torts, § 564; Gatley on Libel and Slander, 4th Ed., 1953, p. 113; Fraser, Libel and Slander, 7th Ed., 1936, pp. 8–9; Odgers, Libel and Slander, 6th Ed., 1929, pp. 123–130; Rhodes v. Naglee, 1885, 66 Cal. 677, 680, 6 P. 863, 865; Harris v. Zanone, 1892, 93 Cal. 59, 66–68, 28 P. 845, 846–847; Richardson v. Cooke, 1911, 129 La. 365, 371, 56 So. 318, 320; Washer v. Bank of America Nat. Trust & Savings Ass'n, 1943, 21 Cal.2d 822, 829, 136 P.2d 297, 301, 155 A.L.R. 1338.

▮ The complaint in the case before us is bare of any facts that could actually be called an inducement in the light of which the article can be said to refer to the appellant. Nor is there a direct allegation that any third person understood the article to refer to the appellant corporation. But, laying aside the question of pleading, there remains the *lack of proof*. The appellant did not offer to prove that any person other than itself or its officers understood the article to refer to the appellant. This alone would be fatal to recovery. Marr v. Putnam, 1952, 196 Or. 1, 28, 246 P.2d 509, 521; Restatement, Torts, 1938, § 564, Comment B; Note, 41 Cal.L.Rev., 1953, p. 144; Gatley on Libel and Slander, 4th ed., 1953, pp. 562–565; State v. Mason, 1894, 26 Or. 273, 38 P. 130, 26 L.R.A. 779; Youssoupoff v. Metro-Goldwyn-Mayer Pictures, Ltd., C.A., 1934, 50 Times Law Reports 581, 587, 99 A.L.R. 864, 876.

In the Oregon case an article was published which spoke of the alarm of established radio dealers over a racket run by persons who advertised radio service on a pickup-and-delivery basis in answer to telephone calls and who absconded with the radios. There was evidence that friends and acquaintances of the plaintiffs who read the article understood it to refer to them. The Court held that such proof was necessary, saying:

"We conclude that persons with a knowledge of the circumstances could reasonably have understood upon reading the article that it referred to the plaintiffs and the question whether it did in fact refer to them was for the jury." Marr v. Putnam, supra, 246 P. 2d at page 521.

In the English case, Youssoupoff v. Metro-Goldwyn-Mayer Pictures, Ltd., supra, a motion picture company had produced a silent motion picture originally based on the life of a Russian monk, Rasputin. The title of the picture was Rasputin, the Mad Monk. It depicted an episode in which the monk either seduced or raped a noble woman of the Czarist court who was referred to as Princess Natasha. Princess Irina Alex-

androvna, wife of Prince Youssoupoff, a resident of Paris, instituted an action in an English court, claiming she was portrayed as Natasha. A jury awarded her damages in the sum of 25,000 pounds. The plaintiff offered proof that her friends who saw the picture and persons conversant with Russian affairs and history understood it to refer to her. The motion picture company in turn, presented proof that it did not intend to refer to the Princess, that, in fact, "they meant somebody else and not the Princess". All the justices agreed that the question was one of fact for the jury to be determined from the evidence. Lord Justice Slesser said on this point:

> "Sir William Jowitt complained that different standards were applied at different times, some of the witnesses being professors, some being friends of the plaintiff, and yet others being readers of Russian books. When the question is as propounded in Hulton and Co., Limited v. Jones, 26 The Times L.R. 128 (1910) A.C. 20, 16 Ann.Cas. 166, and later cases, what persons of a reasonable class might think about a matter, I can see no objection to the fact that it is sought to be proved that persons who read Russian books, persons versed in Russian history and friends of the plaintiff all conceived this imaginary Princess Natasha to be the plaintiff. The fact that the matter was approached from several angles and that different persons from different points of view took the same view seems to strengthen and not to weaken her case, because, from all these angles, these persons came and all said, some with certainty, some with comparative doubt, but at any rate in the end, that sooner or later in the film they made up their minds that this was meant to represent the plaintiff." (p. 876.)

The correctness of these rulings cannot be questioned. The Oregon ruling has added significance because such proof was required despite the fact that Oregon has a section, § 1–908, O.C.L.A. from which A.C.L.A. § 55–5–13 was taken. Provisions of this character which are common to code states do not do away with the need to allege and prove where the reference to the plaintiff does not appear on the face of the publication that persons other than the plaintiff understood the article to refer to him. There is no such proof in this record. This conclusion, like the one concerning the conflict between the special questions and the general verdict, would not warrant a judgment for the defendant.

## V

### The Article Is Not Libelous ·

However, we are of the view that the article involved is not a libel whether we consider it by any standard definition or in the context of fair comment. Of the two paragraphs designated by the appellee as libelous, the first merely says that "they are unable to comply with the requirements of financial responsibility, preventive maintenance, inspection, accounting and the innumerable requirements necessary to operate safely, efficiently and economically." The second paragraph states that they are "spending their stockholders' money in operating expenses, running up bills for labor, rent, taxes, etc., which they cannot pay, carrying no insurance and withdrawing from Alaska in the winter when revenues fall off." As Alaska does not define civil libel, we may adopt as a standard definition of libel that contained in the Civil Code of California which declares libelous every false and unprivileged publication which exposes a person to hatred, contempt, ridicule or obloquy or causes him to be shunned or avoided or which tends to injure him in his occupation. California Civil Code, § 45. This is the common law definition generally adopted by the authorities. Restatement, Torts, § 559; Newell on Libel and Slander, 4th Ed., 1953, p. 15; Prosser on Torts, 1941, pp. 793–794; 53 C. J.S., Libel and Slander, § 1(2) (a).

It is to be borne in mind that we are dealing with a corporation and not an individual. While it is true that a corporation may be libeled, 53 C.J.S., Libel and Slander, §§ 146, 147; 33 Am.Jur., Libel and Slander, § 193, pp. 183, 184, by the very nature of things, what is libel against an individual may not necessarily be a libel against a corporation or an unincorporated company. Since a corporation has no character to be affected by libel and no feelings to be injured, an article to be libelous as to a corporation must have a tendency to directly affect its credit or property or cause it pecuniary injury. The matter must, in the language of the Restatement, tend "to prejudice it in the conduct of its trade or business or to deter third persons from dealing with it". Restatement, Torts, § 561; Adolf Philipp Co. v. New Yorker Staats-Zeitung, 1914, 165 App.Div. 377, 150 N.Y.S. 1044; New York Society for Suppression of Vice v. MacFadden Publications, 1932, 260 N.Y. 167, 183 N.E. 284, 86 A.L.R. 440; Western Broadcasting Co. v. Times Mirror Co., 1936, 14 Cal.App.2d 120, 124, 57 P.2d 977; National Labor Relations Board v. Peter Cailler Kohler Swiss Chocolates Co., 2 Cir., 1942, 130 F.2d 503, 506; Life Printing & Pub. Co. v. Marshall Field, 1946, 327 Ill.App. 486, 64 N.E.2d 383. Notes, Action by Corporation for Libel or Slander, 52 A.L.R. 1199, 86 A.L.R. 442.

Illustrative of the character of imputations which have been held libelous against corporations are the following:

Accusing a company of fraudulently and illegally misrepresenting the nature of the cargo contained in its ship by falsifying the manifest and other documents and that it was engaged in violating the laws of this country by conveying, under circumstances of concealment and misrepresentation, a large supply of copper to Norway, whence it could be easily transported to the Central Powers with which we were then at war, and which in accordance with general knowledge were much in need of the material.[2]

Publication of two anonymous letters stating of the plaintiff, a temperance society, that its leaders are "scabs, men who have been in the reformatory, men who have run away to this country, wife deserters", etc., that "the plaintiff profits through conducting gambling" etc.[3]

Charge that a corporation placed a negro foreman as boss over white girls; and that it was on the unfair list, when the corporation maintained a union shop and had union labor patronage.[4]

Charge that a company is a second-hand dealer, puts in inferior work, has a scab establishment and has not a mechanic in its place.[5]

Charging that a coal dealer, at the time of a coal famine, when the people were suffering for want of fuel, not only charged extortionate prices for its coal, but actually refused to sell coal, even at such extortionate prices, to people suffering from sickness.[6]

"Such a charge", said the court, "is libelous, because imputing *mean* and *abhorrent* conduct to the plaintiff in the conduct of its business, and thus tending necessarily to injure it in such business."

The two paragraphs of which the appellant complains as the gist of the libel, summed up, contain only two statements (1) that certain types of

2. Den Norske, etc., v. Sun, etc., Ass'n, 1919, 226 N.Y. 1, 122 N.E. 463.

3. Finnish Temperance Society v. Finnish Socialistic Pub. Co., 1921, 238 Mass. 345, 130 N.E. 845, 846.

4. Axton Fisher Tobacco Co. v. Evening Post Co., 1916, 169 Ky. 64, 183 S.W. 269, L.R.A.1916E, 667.

5. Pennsylvania Iron Works Co. v. Voght Machine Co., 1906, 96 S.W. 551, 29 Ky.Law Rep. 861, 8 L.R.A.,N.S., 1023.

6. Gross Coal Co. v. Rose, 1905, 126 Wis. 24, 105 N.W. 225, 226, 2 L.R.A.,N.S., 741.

companies are not in a position to comply with the rigid requirements of the Communications Act, 47 U.S.C.A. § 151 et seq., and (2) that they provide only limited service by withdrawing from Alaska in the winter time and that the stockholders' money is spent in operating expenses, labor, rent and taxes.

We cannot see how either is libelous. It charges nothing illegal, nothing fraudulent. To say that a company cannot comply with the high requirements as to safety is no more than saying that the old-fashioned corner grocery run by an individual cannot render the efficient service of the super market or that a small aluminum or steel company, operating with limited funds, cannot compete with the large steel corporations or that a small automobile company cannot furnish the standard merchandise which the "Big Six" can. The statement that they incur bills which they cannot pay is not libelous as to a corporation. It does not charge insolvency. Read as a whole, the paragraph merely means that by limiting themselves to operations for a part of the year only, they are not in a position to make money but spend the stockholders' money.

It is an established principle in the law of libel that it is never libelous to accuse one of doing a legal act although strong epithets are used in describing the act. The usual illustration is that it is not libel to charge one with pleading the statute of limitations, 53 C.J.S., Libel and Slander, § 13, page 60; Hollenbeck v. Hall, 1897, 103 Iowa 214, 72 N.W. 518, 39 L.R.A. 734, or pleading the illegality of a contract, Homer v. Engelhardt, 1875, 117 Mass. 539, or resorting to bankruptcy to avoid payment of all debts. In re Cummings, D.C.Cal., 1949, 84 F.Supp. 65.

A New York case illustrates the point very clearly. In Crashley v. Press Pub. Co., 1904, 179 N.Y. 27, 71 N.E. 258, the court had under consideration an article which stated that plaintiff had taken part in a rebellion in Brazil, headed by one De Gama, the article stating that

"headquarters of the revolutionists were in a small boat shop in the Rua Ouvidor, kept by a certain Crashley, an Englishman of more or less indifferent repute". The article further stated that De Gama, the insurgent leader, had set about raising money in aid of the revolution, and had "issued a circular to the effect that, in the event of the revolt's success, the new government would turn the Brazilian National Railway, which is owned by the government, and is one of its largest sources of revenue, into a stock corporation, and issue stock in payment of all loans contracted by the insurgents"; that

"he agreed, through his agents, the Bank of Rio de Janeiro, which existed only in name, but which was really the Crashley crowd, to issue, in return for the payment of gold in any sum, from one pound up, a receipt which would entitle the holder to shares of stock equal to three times the amount contributed to the rebel funds"; that "thousands of the English and Portuguese bit at the tempting bait; gold poured into the treasury. Nearly every Englishman, and the majority of the Portuguese, from the humblest bank clerk to the capitalist, invested in the enterprise, which, through the plausible rumors circulated by the Crashley crowd, seemed sure of success."

The article further stated that, provisions and ammunition getting low, the conspirators started in with renewed energy, and the "Crashley mill was set to work grinding out more lies against the Government'," that the English Minister helped along the conspiracy and "after every fresh lie from Crashley's would call a meeting of the diplomatic corps and beg his confreres to urge upon the government the recognition of De Gama as a belligerent".

It was urged that this article was libelous *per se*, as tending to expose plaintiff to hatred, contempt, ridicule and obloquy.

The Court of Appeals of New York held that it was not libelous *per se*, saying:

"The article was not libelous *per se*. To complain of an article as being libelous, because charging the complainant with taking part in a revolt or rebellion within the government of Brazil, is quite insufficient, in the absence of an allegation of the existence of some statute making such an act a treasonable offense, and prescribing pains or penalties for the commission of the crime." 71 N.E. at page 259.

The foregoing case was followed by the Supreme Court of California in Mellen v. Times Mirror Co., 1914, 167 Cal. 587, 140 P. 277, 278. In that case it was claimed that an article in The Los Angeles Times charged the plaintiff with "filibustering" and "violating the neutrality" of the United States. The Court, however, held that, although the word "filibustering" was used in the article, the facts in the article did not constitute a violation of the neutrality of the United States Government, saying:

"The word 'filibustering' at the head of the article, when read in connection with the remainder of the article, cannot be read as conveying any other meaning. No facts are alleged upon which it can reasonably be claimed that this charge imputed to plaintiff anything dishonorable or disreputable, or anything that could expose him to hatred, contempt, ridicule, or obloquy, or cause him to be shunned or avoided by any one, or that could cause him any injury, assuming always that no crime was charged. Of course, under the circumstances, there is nothing discreditable in the secrecy alleged to have been

observed as to the nature of the cargo.

"In view of the decisions, it seems clear that the acts attributed to plaintiff and his associates by the article in question, did not constitute a crime under any law of the United States."

Similar cases are Wood v. Star Pub. Co., 1916, 90 Wash. 85, 155 P. 400, which held an article criticizing the methods of "the anti-recall gang" not to be libelous although the word "bribery" was used; Flanagan v. Nicholson Pub. Co., 1915, 137 La. 588, 68 So. 964, 965, L.R.A. 1917E, 510, in which a labor union leader who assisted San Francisco to secure the Panama Fair was characterized as a "traitor", "dangerous and suspicious character". But as the context showed that all he was being charged with was "disloyalty" to New Orleans, the Court held that there was no libel.

Other cases embodying the same principle are: Emde v. San Joaquin County Central Labor Council, 1943, 23 Cal.2d 146, 158–159, 143 P.2d 20, 27, 28, 150 A. L.R. 916 (charging an employer with having "initiated a destructive labor policy" that he was "unfair" to labor, that he "violates contract" with a union and "openly violated its word" by hiring non-union teamsters); Steenson v. Wallace, 1936, 144 Kan. 730, 62 P.2d 907 ("illegal fees" charged to county attorney).[7]

## VI

### The Article Was Fair Comment

So if the statements in the article concerning the appellee are read in the light of these principles, there is nothing in the imputations, that can be said to be libelous. But when we consider the article as a whole, the inevitable conclusion must be that it was a fair comment upon a matter of public interest. The very

7. Among the later cases are: Holway v. World Pub. Co., 1935, 171 Okl. 306, 44 P.2d 881; Riley v. Press-Telegram Pub. Co., 1936, 17 Cal.App.2d 456, 62 P.2d 386; Sullivan v. Meyer, 1937, 67 App.D.C. 228, 91 F.2d 301; Montgomery Ward & Co. v. McGraw-Hill Pub. Co., 7 Cir., 1944, 146 F.2d 171; Thompson v. Osawatomie Pub. Co., 1945, 159 Kan. 562, 156 P.2d 506; Schy v. Hearst Pub. Co., 7 Cir., 1953, 205 F.2d 750.

title of the article shows what the aim was. They were not discussing *personalities*. They were discussing *subjects*. The *matter* discussed was the type of carriers Alaska wanted. The article took note of the criticism of Civil Aeronautics Board by non-scheduled carriers. It discussed the type of service the non-scheduled carriers had given, the use of cheap surplus equipment. It approved the policy of the Board in requiring adequate service to satisfy the economic, postal and defense needs of Alaska. It stated that some business such as water, telephone and electricity must remain noncompetitive and it urged a similar attitude on the part of the Civil Aeronautics Board. It said that the Board had been hampered by public opinion which had demanded unlimited competition. It questioned the type of service that would be had if they relied on carriers who withdrew during the winter months. It pointed out that Alaska air lines were taking passengers for a low fee to testify at statehood hearings. And finally, it criticized certain members of the Alaska Development Board for having encouraged criticism of the Civil Aeronautics Board.

The operation of airplanes is a matter of public concern. Airplanes are under the federal regulation of the Civil Aeronautics Board. 49 U.S.C.A. § 401 et seq. And so important is its function as to Alaska that it may incur obligations payable out of subsequent appropriations. The article was directed to a *subject matter*, not to a *person or corporation*. In the circumstances, the article did not exceed the right of fair comment which protects comment and criticism on matters of public interest.

A West Virginia case has stated the principle in this language:

"The distinction between a statement with reference to private gossip and scandal and one concerning an act or conduct of public interest is so palpable as to require no elucidation. Consideration of peace and order between individuals calls for repression and punishment of false and defamatory statements of fact concerning the private person. There are equally cogent reasons for liberality of statement in matters of public concern. A citizen of a free state having an interest in the conduct of the affairs of his government should not be held to strict accountability for misstatement of fact, if he has tried to ascertain the truth and, on a reasonable basis, honestly and in good faith believes that the statements made by him are true." Bailey v. Charleston Mail Ass'n, 1943, 126 W.Va. 292, 306, 27 S.E.2d 837, 844, 150 A.L.R. 348.

■ In order to achieve this result, the comment must satisfy these conditions: (1) it must relate to a matter of public interest; (2) it must relate not to a person but to his acts. Hence it must not contain imputations of corrupt or dishonorable motives to the persons whose conduct or work is criticized, save insofar as such imputations are warranted by facts; (3) it must be based on facts truly stated; (4) it must be the honest expression of the writer's real opinion on the facts which appear in the publication. However, misstatements of facts are permissible in the view of the latest authorities. See, Emde v. San Joaquin County Labor Council, supra, 23 Cal.2d at pages 154–155, 158–161, 143 P.2d at pages 25–26, 27–29; Sweeney v. Patterson, 1949, 76 U.S.App.D.C. 23, 128 F.2d 457, 458–459, distinguishing Washington Times Co. v. Bonner, 1936, 66 App.D.C. 280, 86 F.2d 836, 110 A.L.R. 393, relied on by appellant; Prosser on Torts, 1941, § 94, pp. 839–840; Ralph E. Boyer, Fair Comment, 1954, 15 Ohio St.L.J. pp. 280–302.

■ At times "fair comment" and "privileged publications" are used synonymously. But, in reality, they are not the same. For in privileged publication there would be libel but for the privileged occasion—while fair comment is not libel. Gatley on Libel and Slander, 4th Ed., 1953, p. 335, et seq.; Restatement, Torts, § 606; Thayer, Legal Con-

trol of the Press, 2 Ed., 1950, §§ 65–68; Thayer, Fair Comment as a Defense, Vol. 1950, No. 2, Wis.L.Rev. p. 289; Note, Fair Comment, 1949, 62 Harvard L.Rev. 1207; Dix W. Noel, Defamation of Public Officers and Candidates, 1949, 49 Col. Law Rev. 875.

Before we apply these general principles to the publication before us, it is well to refer to certain cases in which the publication and the circumstances under which it was made bear great smilarity to the publication before us.

In a California case, Howard v. Southern California Associated Newspapers, 1950, 95 Cal.App.2d 580, 213 P.2d 399, a newspaper printed a letter during a recall movement which called it a "mala fide" attempt to discredit certain officials, a "sinister movement", and ended with the following exhortation:

> "This sinister movement must not be permitted to continue to malign the democratic foundations of our city government. Mr. Howard and his entire recall committee have proved themselves a disgrace to Glendale, and it should be the desire of every citizen to destroy this dangerous and unjust element by casting his vote against the recall." 95 Cal.App.2d at pages 582–583, 213 P.2d at page 401.

The trial court sustained a demurrer to the amended complaint without leave to amend. On appeal the Court said that the matter did not exceed the limits of fair comment:

> "Publications by which it is sought to convey pertinent information to the public in matters of public interest are permitted wide latitude. In controversies of a political nature, in particular, the circumstances often relieve statements, which might otherwise be actionable, of possible defamatory imputations. Mere expressions of opinion or severe criticism are not libelous if they clearly go only to the merits or demerits of a condition, cause or controversy which is under public

scrutiny, even though they may adversely reflect upon the public activities or fitness for office of individuals who are intimately connected with the principal object of the attack." 95 Cal.App.2d at page 584, 213 P.2d at page 402.

To the argument that the epithets used are libelous, the Court said:

> "Considered with the preface, as the author said it should be, the final paragraph merely enlarged upon the idea that no sufficient cause was being advanced for the recall of the councilmen. The justness and good faith of the recall were questioned without any words casting doubt upon the character of the members of the recall committee or the integrity of their actions apart from their active support of the recall.
>
> "In the words of the court in Taylor v. Lewis, 132 Cal.App. 381, 386, 22 P.2d 569, the article ' * * * does not charge anything that would follow appellant into his private life and stamp him as dishonest or bring upon him in the capacity of a private citizen the contempt of his fellows', etc. This, we take to be a proper test on a charge of *libel of words spoken or written concerning those who are participating on one side or the other of a political issue.*" 95 Cal. App.2d at page 585, 213 P.2d at page 403. (Emphasis added.)

The facts in the foregoing case are significantly similar to the facts in the case before us. There, as here, there was a controversy. There, a recall, here, a movement as to which type of air transportation Alaska desired. Here, as there, the two parties, the non-certificated carriers and the newspaper were participating on one side and the other of a public issue. There, as here, the chief impact of the article was on the issue and not on personalities.

In Brewer v. Hearst Publishing Co., 7 Cir., 1950, 185 F.2d 846, 849,

the court had before it an article which attacked the activities of a certain person who was a proponent of vivisection. The plaintiff was a professor of veterinary medicine and the article referred to him as holding a job " 'caring for tortured' " dogs and cats. The court held that the circumstances of the publication of the article showed that it was fair comment and that the plaintiff, a proponent of vivisection, was subject to criticism on the part of those who opposed it, saying:

> "Plaintiff contends that the question of fair comment and criticism may not be determined on a motion to dismiss. However, that is not the law of Illinois. In Kulesza v. Chicago Daily News, Inc., 311 Ill.App. 117, 35 N.E.2d 517, and Hahnemannian Life Insurance Co. v. Beebe, 48 Ill. 87, the Illinois courts clearly held that fair comment and criticism on matters of public interest is not actionable, that the question is one of law, and may be determined on a motion to dismiss.

> "Plaintiff, a proponent of vivisection, participated in certain activities to influence public opinion in support of pending legislation which he deemed favorable to his cause. In doing so, he invited criticism and free expression by others of their opinion of his conduct and cause. He should not be heard to complain if the criticism so invited is not gentle." 185 F.2d at page 850.

If the comment is fair, severity in the use of denunciatory language will not vitiate it. Kulesza v. Chicago Daily News, 1941, 311 Ill.App. 117, 35 N.E.2d 517; Berg v. Printers' Ink Pub. Co., D.C.N.Y., 1943, 54 F.Supp. 795, affirmed 2 Cir., 141 F.2d 1022; Hartmann v. Boston Herald-Traveler Corp., 1948, 323 Mass. 56, 80 N.E.2d 16; Tracy v. Wm. J. Kline & Son, Inc., 1949, 274 App.Div. 149, 81 N.Y.S.2d 1. And see, Aldrich v. Boyle, 1951, 328 Mass. 30, 101 N.E.2d 495, 496.

In all these cases the courts have taken into consideration what the court in Aldrich v. Boyle, supra, called the "hortatory appeal" used on certain occasions. Back of these decisions is the thought consistently followed in most courts in the land that matters of public concern are the legitimate object of a citizen's comment. Mr. Justice Oliver Wendell Holmes wrote in an old case, Gandia v. Pettingill, 1912, 222 U.S. 452, 457, 32 S.Ct. 127, 56 L.Ed. 267:

> "For apart from the question whether attributing to the plaintiff conduct that was lawful, as the plaintiff says, could be a libel, Homer v. Engelhardt, 117 Mass. 539, he was a public officer in whose course of action connected with his office the citizens of Porto Rico had a serious interest, and anything bearing on such action was a legitimate subject of statement and comment."

And what applies to a public character applies also to a public body, such as an aviation company serving the public. In the light of what precedes, we are of the view that the article was not written of or concerning the appellant, that the appellant failed to show either by the allegations of his complaint or by his proof that the article was understood by anyone other than itself to refer to it. The article dealt with the state of airplane transportation in Alaska. It sought to enlist the sympathy of the public toward the attitude of the Civil Aeronautics Board in trying to discourage too much competition between well-established companies able to comply with the highest standards and non-scheduled concerns which were not financially or otherwise capable to serve Alaska adequately. It imputed no evil motives to any of the persons connected with the non-scheduled activities. It merely expressed the view that they did not serve the best interests of Alaska. We believe that the cases here discussed, taken from various jurisdictions some of which, like California, recognize the liberal rule of privilege of publications in the public interest, others, like Massachusetts, New York and Illinois, which do not recognize it, clearly call for the conclusion that the publica-

tion was not libelous but that it appears on its face that it was a fair comment on a matter of public interest. In the circumstances, free as we are, in the absence of an Alaska Jurisprudence to the contrary, to apply to Alaska the principles here enunciated, no recovery can be had under it. As the judgment in favor of the appellees was warranted upon the grounds just given and no cause of action could be based on the article, the judgment is affirmed.

POPE, Circuit Judge (concurring).

I am frank to say that I find nothing in the verdict which required a judgment for the defendant. The questions framed by the court for answer by the jury were designed to ascertain whether the words in the newspaper were spoken of a very large, all-inclusive group of persons, or whether, as Judge YANKWICH puts it, it referred to a group "small enough so that a person reading the article may readily identify the person as one of the group." Question 1 described a limited group, which the jury, by their answer to Question 2, said numbered from 5 to 10. The jury said the reference was to this smaller group. The questions 3, 5 and 7 simply described larger, and generally all-inclusive groups. Thus No. 3 referred to "all air carriers * * * that did not have a certificate of convenience". No. 5 referred to "all air carriers * * * that did not have a certificate" and also those with certificates when the latter were making non-scheduled flights. No. 7 referred to "all non-scheduled air carriers". The jury simply answered that the group was not any of these large, or all-inclusive groups described in 3, 5 or 7. I think this may be made plain if we consider that, in substance, question 1 referred to what, for convenience, we may call "*large* non-scheduled air carriers", while question 7 referred to "non-scheduled air carriers, *both large and small.*" The jury has said no more than that the article referred to all of the large ones, but it did not refer to every such carrier, both large and small. Even if some inconsistency could be found between the answers to No. 1 and No. 7, the only result would be to require a new trial. Mounger v. Wells, 5 Cir., 30 F.2d 521. But in my view there is no such inconsistency. Much less can the answer to No. 7 be construed to be a finding that the article did not refer to the plaintiff. To make it do that it would be necessary to change the question to read: "Did the editorial refer to *any* non-scheduled air carrier?"

Notwithstanding my disagreement on this point, I concur in what is said respecting the lack of proof as to how the article might be understood, and also that the publication was not actionable because it was within the rules of fair comment.

At the argument counsel for appellant said, in answer to inquiries as to whether the article might not be fair comment, that such defense would not be available because here was a charge of a want of financial responsibility, that this was a statement of fact, not of opinion, and that fair comment cannot cover false statements of fact, citing Washington Times Co. v. Bonner, 66 App.D.C. 280, 86 F.2d 836, 842, 110 A.L.R. 393. It is true that there, in laying down the law for the District of Columbia,[1] the court rejected the rule laid down in the leading case of Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 20 L.R.A.,N.S., 361, that the right of fair comment extends, in the absence of malice, to misstatements of fact.[2] But as Judge Yankwich says, the later, and I think the better considered authorities, disagree:

---

1. The court spoke of it as "the rule in the Federal courts". That was in 1936, before Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

2. It referred to that as the rule of "a few states", and asserted that "the great weight of authority" was to the contrary. According to Mr. Prosser (Prosser on Torts, p. 840), the authorities are rather evenly divided.

with the District of Columbia court. Thus in Snively v. Record Pub. Co., 185 Cal. 565, 198 P. 1, the California court, reversing its previous stand, expressly approved the Coleman v. MacLennan rule. I agree that even if we were to find that the article here did contain a statement of fact, yet we should hold that the rule to be applied in Alaska requires that the publication be regarded as fair comment.